2 F.3d 1424
 FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate
capacity, Plaintiff-Appellee,
v.
Gilbert BIERMAN, V. Edgar Stanley, Robert Marcuccilli,
Judith Stanley, Dan Stanley, and John Boley,
Defendants-Appellants.
 Nos. 91-2893 & 91-2941.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 10, 1992.
Decided Aug. 10, 1993.
 
 Philip A. Whistler, Fred R. Biesecker, Charles E. Greer, Ice, Miller, Donadio & Ryan, Indianapolis, IN, C. Erik Chickedantz, Miller, Carson, Boxberger & Murphy, Fort Wayne, IN, Edward J. O'Meara (argued), F.D.I.C., Washington, DC, for plaintiff-appellee.
 John R. Wilks (argued), Wilks & Kimbrough, Fort Wayne, IN, for Gilbert Bierman.
 F. Walter Riebenack (argued), Linda J. Peters, Fort Wayne, IN, for V. Edgar Stanley, Robert Marcuccilli, Judith A. Stanley, Dan Stanley, John Boley.
 Before FLAUM and RIPPLE, Circuit Judges, and SHADUR, Senior District Judge.*
 RIPPLE, Circuit Judge.
 
 
 1
 In November 1985, after a lengthy investigation of the faltering Allen County Bank (ACB) in Fort Wayne, Indiana, the Indiana Department of Financial Institutions (DFI) began liquidation proceedings and the Federal Deposit Insurance Corporation (FDIC) was appointed receiver. On November 27, 1987, the FDIC filed suit against seven former directors and officers of ACB. It alleged breaches of common law and statutory duties that resulted in losses to the bank. The case was tried to the bench in July 1991, and judgment was entered in the amount of $574,809.36 against the defendants,[1] jointly and severally, with regard to three of the eight groups of loans that were at issue. Federal Deposit Ins. Corp. v. Stanley, 770 F.Supp. 1281 (N.D.Ind.1991). For the reasons that follow, we affirm the judgment of the district court.[2]
 
 
 2
 * BACKGROUND[3]
 
 
 3
 As the district court noted at the beginning of its comprehensive opinion, this litigation consumed two years of pretrial activity and involved a lengthy, complicated trial. We shall not attempt to repeat here all of the detail so painstakingly set forth by our colleague in the district court. Rather, we shall assume a familiarity with that opinion and limit our efforts to orienting the reader to the discussion of issues on appeal. Indeed, we shall defer some discussion of the facts until our consideration of particular issues.
 
 A. Pre-Closure and Closure Events
 
 4
 As early as August 1981, the FDIC began to examine ACB's financial condition and issued a Report of Examination indicating that the classified assets of the bank had risen to 124.2% of total capital and reserves. The FDIC termed this state of affairs "staggering" and cautioned ACB that its loan portfolio was in poor condition, that better quality loans must be acquired, and that the directors must "adequately monitor the lending function." Stanley, 770 F.Supp. at 1285. On February 10, 1982, the FDIC and the DFI entered into a Memorandum of Understanding with ACB requiring, among other things, a 50% reduction of substandard loans within 360 days and the provision of loan servicing and collection policies.
 
 
 5
 Despite these warnings, ACB continued to deteriorate. On September 11, 1982, the FDIC began to examine ACB.[4] The FDIC Report of Examination was issued on November 18, 1982, and showed a loan delinquency rate of more than 25% and many loans that were not supported by current credit information. The Report stressed poor lending practices, including poor supervision, incomplete credit information, self-dealing, and overlending generally. The Report specifically mentioned that little or no credit information had been maintained for commercial loans, including participation loans purchased from affiliated banks.
 
 
 6
 On February 22, 1983, the FDIC and the DFI entered into a second Memorandum of Understanding with ACB under which ACB agreed to implement an amended written loan policy and to reduce its substandard assets by $1,200,000 by December 31, 1983. ACB did not fulfill its agreement, and on November 22, 1985, liquidation proceedings were initiated pursuant to Indiana Code Sec. 28-1-3.1-1 et seq., and the FDIC was appointed receiver of ACB pursuant to Indiana Code Sec. 28-1-3.1-5. On the same date, the FDIC, as receiver, sold certain ACB assets to the FDIC in its corporate capacity pursuant to Indiana Code Sec. 28-1-3.1-7 and 12 U.S.C. Sec. 1823(c)(2)(A). Among these assets were the claims against ACB directors and officers for failing to perform or poorly performing their duties.
 
 B. The Appellants
 
 7
 The appellants are former directors and officers of ACB. V. Edgar (Ed) Stanley and Robert Marcuccilli sat on the ACB Board of Directors (Board) from March 24, 1982, until May 22, 1984; Ed Stanley served as president from March 24, 1982, until September 13, 1983. Judith Stanley sat on the Board between March 24, 1982, and May 8, 1984; Dan Stanley served between May 25, 1982, and May 8, 1984; and John Boley served between 1970 and June 16, 1983. Finally, Dr. Gilbert Bierman served from May 1978 until April 9, 1984. During the period when they were ACB directors, the defendants were also shareholders of the bank.
 
 
 8
 In addition to serving on the Board, Ed Stanley and Judith Stanley also served as directors of Leiters Ford State Bank (Leiters Ford), Counting House Bank, and Western State Bank. Mr. Marcuccilli served concurrently as director of Counting House Bank and Western State Bank, and he served until January 1983 as a director of Leiters Ford.
 
 
 9
 Mr. Boley attended only one Board meeting between November 9, 1982, and his resignation in June 1983. Dr. Bierman was advised by Ed Stanley in 1982 that he need not attend Board meetings, but that ACB wished to retain his name as director. Accordingly, Dr. Bierman attended no Board meetings after the October 5, 1982 meeting.
 
 C. The District Court
 
 10
 In its extensive opinion, the district court dealt with both the legal and factual issues presented by the parties. We shall set forth here the basics of that exhaustive treatment and rearrange the order of presentation in order to accommodate more efficiently our review of the matters presented to us in this appeal. The district court realized that the liability of the directors was dependent on two issues, standard of care and causation. It addressed, with respect to each, both the appropriate legal principles and the application of those principles to the facts of this case.
 
 1.
 
 11
 With respect to the appropriate standard of care, the district court held that the degree of care to which the bank directors were bound is that which ordinarily prudent and diligent persons would exercise under similar circumstances. Stanley, 770 F.Supp. at 1310. This standard requires that the court review all of the circumstances of the particular case. Under this standard, the directors had a duty to ascertain the condition of the bank and exercise reasonable control and supervision over it. Id. This duty requires that the directors devote, continued the court, a sufficient amount of time and energy to overseeing the bank's affairs, to attending meetings, and to reading the reports of federal and state bank examiners. Id. These duties, held the court, were not delegable and could not be discharged solely by reliance on others. Id. at 1310-11.
 
 
 12
 With respect to the burden of proof, the district court held that, as a general matter, the burden rested with those who claim a breach of the director's duties. However, when a director approves a transaction between the bank and another institution in which he has an interest, it is the director's obligation to prove that there was no breach of his duty of loyalty and good faith and that the transaction was fair and reasonable to the bank. Id. at 1311.
 
 
 13
 The district court also recognized that, in order for a director to be liable, any breach of these standards must also be the proximate cause of the injury to the bank. Under this principle, held the district court, if the defendant's negligence is a substantial factor in producing the injury and if the injury is one of a class that was reasonably foreseeable at the time of the defendant's wrongful act, a sufficient causal relationship exists. Id. at 1309-10.2.
 
 
 14
 The court took pains to detail the evidence regarding the soundness of the loans at the time ACB acquired them and to evaluate them in light of the foregoing principles. It determined that a prudent banker would not have assumed the Abbott, DeVries, and Conn loans. It found the seven directors jointly and severally liable to the FDIC in the amount of $405,599.45; in addition, it found all directors, save for Mr. Boley, jointly and severally liable to the FDIC on an additional $169,209.91. Id. at 1315. The court found that Mr. Boley was no longer a member of the Board at the time the Conn loans were made. We shall summarize each of the transactions in which the district court determined that the directors had breached their duty of care to ACB.
 
 
 15
 a. Abbott Coal and Energy Loans (Abbott)
 
 
 16
 On December 30, 1982, ACB was assigned without recourse an installment lease in the amount of $130,484 between Northern Indiana Leasing and Abbott, which was secured by a bulldozer. Ed Stanley and Mr. Marcuccilli were "interested directors" because they were vice-presidents of Northern Indiana Leasing when the lease was sold to ACB. On February 12, 1983, ACB purchased a $60,000 commercial loan to Abbott from Counting House Bank. At the time, Ed Stanley, Judith Stanley, and Mr. Marcuccilli were "interested directors." The district court found that Abbott's financial condition at the time ACB acquired the lease and loan was very poor. Id. at 1288. Indeed, Abbott filed Chapter 11 bankruptcy on June 25, 1985.
 
 
 17
 The district court engaged in a detailed analysis of the transactions. The court first noted that, prior to purchasing the Abbott lease and the Abbott loan, the ACB had been involved in only one coal-related transaction and had written that particular transaction off as a $39,682 loss on its September 1982 FDIC Report of Examination. In the district court's view, this recent unprofitable experience should have made ACB somewhat hesitant about dealing with Abbott. After analyzing the financial statement that had been available to ACB at the time it purchased these assets, the court concluded that Abbott was operating on borrowed money rather than on operating income. The court also noted that, although total assets on September 30, 1982, were $2,459,733, total assets on July 31, 1981, had only been $1,876,505, and nearly $1,000,000 of the September 30, 1982 assets were in the form of "notes receivable" with no indication of the company's ability to collect on the notes. The court also noted that Abbott's partners' equity had been cut nearly in half between July 31, 1981, and September 30, 1982.
 
 
 18
 Turning to the balance sheets of two of the Abbott partners, Robert Goldman and William Gladstone, the court noted that these documents appeared, on a superficial reading, to be reassuring. The court then determined, however, that Goldman's balance sheet appeared to be misleading in several respects. First, Goldman had attributed $750,000 in assets to his interest in Abbott when, during the same period, the firm's balance sheet showed the total partners' equity was $695,109. Other major assets were listed without any supplemental documentation. Nor were any liabilities other than utilities and insurance listed. In short, although Goldman had included his interest in Abbott as an asset, he had failed to include his portion of the firm's liabilities in the liability portion of his balance sheet.
 
 
 19
 Gladstone's balance sheet of December 31, 1981, suffered, held the district court, from similar deficiencies. He listed among his assets $500,000 for his interest in Abbott and $300,000 for "oil and gas." The latter item was not supported by any documentation. Gladstone's balance sheet also listed no liabilities, but did list a $2,000,000 contingent liability with Liberty National Bank on Abbott. On the basis of all this evidence, the court agreed with the testimony of the bank examiner for the FDIC that a prudent banker would not have relied on these financial statements without some supporting documentation.
 
 
 20
 The court then turned to the question of whether Abbott's payment history on the lease in question showed that Abbott had sufficient cash flow to pay off the lease. Here, the court found the evidence partially favorable and partially unfavorable to the directors. The court noted that, although ACB's payments were somewhat irregular, its record could not be characterized as "sporadic." Nevertheless, pointed out the district court, Abbott did default on the lease and consequently made some arrangements to ensure that payments were made. The evidence showed that ACB had received some funds directly from Indiana Power and Light Company to pay for the claim and that Mr. and Mrs. Goldman had signed an agreement in which they jointly and severally guaranteed credit extended to Abbott by ACB to the extent of $100,000. The court also pointed out that the Small Business Administration approved, in early 1984, a $450,000 loan to Abbott and had apparently found the company creditworthy at that time.
 
 
 21
 The district court then undertook a lengthy examination of whether the bulldozer was adequate collateral to secure payment on the lease. The court concluded that ACB should have predicted that the bulldozer would depreciate rapidly when in use in the coal mine and held that any loss suffered by ACB after acquiring the lease was a result of its failure to require sufficient collateral.
 
 
 22
 With respect to the second transaction with Abbott, a $60,000 commercial loan, the court noted that the loan was secured by two pieces of heavy construction equipment, but the record showed that the equipment was subject to a blanket lien asserted by Leasing Service Corporation and perfected in July 1981. Liberty National Bank also had a lien on the same equipment filed in November 1982.
 
 
 23
 The court found that the directors were liable on both the loan and the lease because they had failed to take sufficient collateral. With respect to the lease transaction, the court held that directors Ed Stanley and Mr. Marcuccilli were "interested directors" and had not satisfied their burden of showing that the transaction did not breach their duty of loyalty and good faith to the bank. The remaining directors, held the court, had not exercised the requisite degree of reasonable care in the transaction. The court then turned to Dr. Bierman's argument that he had "effectively resigned" on October 5, 1982, when he attended his last Board meeting. The court rejected this argument for several reasons. It noted that Dr. Bierman had continued to receive "committee fees" after that date and, indeed, had been re-elected to the Board in March 1983. It was his duty, held the court, to resign from the Board if he no longer desired the stockholders to believe that he was fulfilling the expected duties of a director. Finally, the court noted that Ed Stanley testified that no loan would have been approved if a Board member "totally objected." The court concluded, on the basis of his testimony, that, if Dr. Bierman had attended these meetings, he could have successfully prevented ACB from purchasing its lease. For the same reason, Mr. Boley was held to be liable for this transaction even though he had not attended the meetings in which it had been discussed.
 
 
 24
 With respect to the Abbott loan that was purchased from the Counting House Bank, Ed and Judith Stanley, and Mr. Marcuccilli were "interested directors" because, during the time in question, they had served on the Board of the Counting House Bank. Dan Stanley, Dr. Bierman, and Mr. Boley, while not interested directors, had breached their duty of care to the bank.
 
 
 25
 b. Sidney DeVries and DeVries Hog and Grain Farm Loans
 
 
 26
 On March 24, 1983, ACB purchased a $70,000 note from Leiters Ford. The district court found, however, that the security interest that had been granted to Leiters Ford was, for all intents and purposes, worthless because LaSalle National Bank had a prior interest in it dating from a March 1980 pledge. In brief, Sidney DeVries had granted to Leiters Ford a security interest in all livestock, crops, and equipment owned and thereafter acquired by him. However, this security interest was preempted by an earlier security interest securing loans granted by Leiters Ford with the participation of LaSalle National Bank. The district court therefore concluded that LaSalle National Bank clearly had a prior interest in the collateral pledged in the March 19, 1980 security agreement and that Leiters Ford's March 24, 1983 loan to DeVries Hog and Grain Farm was unsecured for all practical purposes. On April 11, 1983, ACB purchased a $40,000 loan to DeVries Hog and Grain Farm from Leiters Ford. Ed Stanley and Judith Stanley were "interested directors." This loan was secured by collateral that had previously been pledged to LaSalle National Bank. In addition, the court found that there was no evidence that a futures contract pledged to secure this loan had any value.
 
 
 27
 Finally, the district court found that, on June 14, 1983, ACB had participated in a loan of $35,000 to Sidney DeVries from Leiters Ford. Of the original loan, ACB's participation was $34,000; Leiters Ford kept $1,000. The defendants claimed that this debt was secured by two indemnifying mortgages and four security agreements that covered DeVries' livestock, equipment, and machinery, as well as his futures account. All of this security had previously been pledged to LaSalle National Bank to cover other debts.
 
 
 28
 After reviewing all of the evidence, the district court concluded that, at least as early as February 1983, Sidney DeVries and DeVries Hog and Grain Farm were facing severe financial difficulties. DeVries had previously failed to obtain a loan from the FmHA, and LaSalle National Bank had refused to participate in any further loans. However, in March, April, and June 1983, ACB purchased three of DeVries' loans from Leiters Ford. The borrowers were not only in financial trouble but could not give ACB any new collateral because that collateral had already been pledged to LaSalle National Bank. The court determined that a reasonably prudent banker would not have participated in these loans. As it had with respect to the Abbott loans, the court determined whether each of the directors was "interested" in the transaction and then employed the appropriate burden of proof in determining liability.
 
 
 29
 c. Conn loans
 
 
 30
 On June 24, 1983, Leiters Ford issued to ACB a participation of $144,755 in a $147,262 loan that it had earlier made to James and June Conn, grain farmers. Ed Stanley and Judith Stanley were "interested directors" because they were directors of both Leiters Ford and ACB at the time. On July 19, 1983, Leiters Ford issued to ACB a participation of $13,000 in a $33,530.19 loan made to the Conns. The district court found that, at the time the loans were made, the Conns had a debt-to-net worth ratio of 2.23 to 1 (or a ratio of 9.51 to 1 after the Conns' inflated valuation of their farm land was taken into account). The district court concluded that a prudent banker would not have participated in the Conn loans. First, the Conns were highly leveraged. Their financial statement as of January 31, 1983, showed that they had debts of $1,575,500 and a net worth of $705,750. According to the FDIC bank examiner, they had over-valued their real estate. The court also noted that they had suffered a net loss of approximately $60,000 in 1982. During that year, the Conns had a total cash income of $249,084 and total cash expenses of $310,794, which netted a loss of $61,710 for 1982. When adjusted for non-farm income, the Conns had a net farm loss of $80,675. While there was some dispute about the matter among the parties, the court found that the Conns had sold crops in 1982 for $203,536 and that, even with this crop income, they had suffered an overall loss of $61,710.
 
 
 31
 The court found that, by the Conns' own reckoning, they would be unable to service the existing debt. The court also emphasized that, while ACB had a security interest in all growing or planted crops on the real estate farmed by the Conns, those liens had been subordinated each year to input lenders in order to allow the Conns to continue to meet operating expenses. Consequently, the court had no difficulty concluding that "[a] prudent banker, in an arm's length transaction, would not have participated in the Conn loans." Stanley, 770 F.Supp. at 1295. As it did with respect to the Abbott transactions, the district court then determined whether each director was "interested" in the particular transaction and applied the appropriate burden of proof. Mr. Boley had resigned prior to the Conn transactions and therefore was held not to be liable for the improvident Conn loans.
 
 3.
 
 32
 In addition to determining that, with respect to the three sets of transactions described above, the directors had breached their duty to ACB and that their breach was a proximate cause of the bank's loss, the district court also rejected the defendants' contention that the FDIC had failed to mitigate bank losses and that it therefore could not claim such losses from the directors. The district court relied upon cases that have explained the "no duty" rule in such circumstances and have held that any duty that the FDIC might owe extends to the public rather than to the directors or officers who are wrongdoers. See FSLIC v. Burdette, 718 F.Supp. 649 (E.D.Tenn.1989) (discussing FDIC v. Greenwood, 719 F.Supp. 749 (C.D.Ill.1989), and FSLIC v. Roy, No. JFM-87-1227, 1988 WL 96570 (D.Md. June 28, 1988)).
 
 
 33
 The defendants relied on FDIC v. Carter, 701 F.Supp. 730 (C.D.Cal.1987). In that case, the court had looked to the Federal Tort Claims Act (FTCA) as the appropriate decisional matrix and had determined that "most of the FDIC's actions when disposing of the assets of a bank are purely ministerial, and are not grounded in social or economic policy. As a result, these actions can serve as the basis for a counterclaim or affirmative defense...." Id. at 735-37. The district court here concluded, however, that United States v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), had effectively overruled Carter when it determined that "[d]ay-to-day management of banking affairs, like the management of other businesses, regularly require judgment as to which of a range of permissible courses is the wisest. Discretionary conduct is not confined to the policy or planning level." Id. at ----, 111 S.Ct. at 1275 (quoted in Stanley, 770 F.Supp. at 1309). The district court read Gaubert as overruling Carter "insofar as Carter holds that the FDIC's actions when disposing of a bank's assets can serve as a basis for reducing the amount of the FDIC's recovery because such actions by the FDIC are ministerial or operational." Stanley, 770 F.Supp. at 1309.
 
 II
 ANALYSIS
 A. Standards of Review
 
 34
 At the outset, we set forth the general standards of review that must govern our scrutiny of the district court's decision. Questions of law are, of course, subject to our de novo review. By contrast, we may disturb the district court's findings of fact only if we determine that they are clearly erroneous. Fed.R.Civ.P. 52(a);[5] Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). In Anderson, the Supreme Court explained the role of the reviewing court under this deferential standard:
 
 
 35
 "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395[, 68 S.Ct. 525, 541, 92 L.Ed. 746] (1948). This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.
 
 
 36
 ....
 
 
 37
 Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. United States v. Yellow Cab Co., 338 U.S. 338, 342[, 70 S.Ct. 177, 179, 94 L.Ed. 150] (1949); see also Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844[, 102 S.Ct. 2182, 72 L.Ed.2d 606] (1982).
 
 
 38
 This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.
 
 
 39
 470 U.S. at 573-74, 105 S.Ct. at 1511. The Court also noted that deference to the factfinder's expertise serves the end of insuring the efficient use of judicial resources. Id. at 574-75, 105 S.Ct. at 1511-12.
 
 
 40
 It is also well-established in this circuit that we shall review mixed questions of fact and law under the clearly erroneous standard. Elberg v. Mobil Oil Corp., 967 F.2d 1146, 1149 (7th Cir.1992); Mucha v. King, 792 F.2d 602, 605 (7th Cir.1986). This standard is especially appropriate when the applicable law is well-settled and the district court had the opportunity to evaluate the demeanor of the witnesses. Ambrosino v. Rodman & Renshaw, Inc., 972 F.2d 776, 784 (7th Cir.1992); Shango v. Jurich, 965 F.2d 289, 291 (7th Cir.1992).
 
 B. Director Liability
 1. General principles
 
 41
 a. standard of care[6]
 
 
 42
 The parties do not dispute the basic principles governing bank director responsibilities:
 
 
 43
 [D]irectors must exercise ordinary care and prudence in the administration of the affairs of a bank, and [ ] this includes something more than officiating as figureheads. They are entitled under the law to commit the banking business, as defined, to their duly-authorized officers, but this does not absolve them from the duty of reasonable supervision, nor ought they to be permitted to be shielded from liability because of want of wrongdoing, if that ignorance is the result of gross inattention....
 
 
 44
 Briggs v. Spaulding, 141 U.S. 132, 165-66, 11 S.Ct. 924, 935, 35 L.Ed. 662 (1891) (holding directors not liable because of illness, retirement, or leave of absence) (quoted in Chicago Title & Trust Co. v. Munday, 297 Ill. 555, 131 N.E. 103, 105 (1921)).[7] In Rankin v. Cooper, 149 F. 1010, 1013 (C.C.W.D.Ark.1907), the court elaborated on the duties of directors:
 
 
 45
 (1) Directors are charged with the duty of reasonable supervision over the affairs of the bank. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision over its affairs. (2) They are not insurers or guarantors of the fidelity and proper conduct of the executive officers of the bank, and they are not responsible for losses resulting from their wrongful acts or omissions provided they have exercised ordinary care in the discharge of their duties as directors. (3) Ordinary care, in this matter as in other departments of the law, means that degree of care which ordinarily prudent and diligent men would exercise under similar circumstances. (4) The degree of care required further depends upon the subject to which it is to be applied, and each case is to be determined in view of all the circumstances.
 
 
 46
 Directors are charged with keeping abreast of the bank's business and exercising reasonable supervision and control over the activities of the bank. See, e.g., Martin v. Webb, 110 U.S. 7, 15, 3 S.Ct. 428, 433, 28 L.Ed. 49 (1884) ("Directors cannot in justice to those who deal with the bank shut their eyes to what is going on around them."); Gallin v. National City Bank, 152 Misc. 679, 273 N.Y.S. 87 (1934) (relying on Briggs and Rankin ).[8] A failure properly to supervise and attend Board meetings may become the basis for a charge of negligence. Bowerman v. Hamner, 250 U.S. 504, 39 S.Ct. 549, 63 L.Ed. 1113 (1919). The fact that an absentee director had no knowledge of the transaction and did not participate in it does not absolve him of liability. See Hoye v. Meek, 795 F.2d 893, 895 (10th Cir.1986) (semi-retired director and chairman who failed to monitor and make necessary inquiries breached his statutory duty of care); Preston-Thomas Constr., Inc. v. Central Leasing Corp., 518 P.2d 1125, 1127 (Okla.Ct.App.1973) ("[W]here the duty to know exists, ignorance resulting from a neglected official duty creates the same liability as knowledge.").
 
 
 47
 A director may not rely on the judgment of others, especially when there is notice of mismanagement. Certainly, when an investment poses an obvious risk, a director cannot rely blindly on the judgment of others. In Rankin, the court specifically recognized a heightened responsibility among those directors who have an inkling of trouble brewing:
 
 
 48
 If nothing has come to the knowledge to awaken suspicion that something is going wrong, ordinary attention to the affairs of the institution is sufficient. If, upon the other hand, directors know, or by the exercise of ordinary care should have known, any facts which would awaken suspicion and put a prudent man on his guard, then a degree of care commensurate with the evil to be avoided is required, and a want of that care makes them responsible. Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them.
 
 
 49
 149 F. at 1013. In Rankin, the directors relied entirely on the bank president to conduct the business of the bank. However, rumors began to circulate that the president was mismanaging, and a government examiner issued a report saying as much and counselling the Board to exercise better vigilance. Despite these warnings, the Board continued to be inattentive. The court found that "the directors should be held liable for all losses that could have been prevented by a proper discharge by them of their duties after [the date that they had notice from the examiner]." Id.
 
 
 50
 Reliance arguments are especially weak when regulators have told directors to take action. See, e.g., FDIC v. Brickner, 747 F.2d 1198, 1202 (8th Cir.1984) (directors could not ignore bank examiner warnings); Atherton v. Anderson, 99 F.2d 883, 891 (6th Cir.1938) (regulators had given repeated serious warnings to the Board, but the members could not insulate themselves from knowledge by failing to read the reports); Rankin, 149 F. at 1013-14 (abundant warning had come through the report of a bank committee and a report of the Comptroller of Currency).[9] Finally, when insider transactions are being contemplated, "[t]he director's duty of inquiry cannot be met by representations of propriety from interested parties; he must be personally satisfied that there was an adequate independent investigation showing the propriety of the transaction." Fitzpatrick v. FDIC, 765 F.2d 569, 577 (6th Cir.1985).
 
 
 51
 b. proximate cause
 
 
 52
 It is well-settled that a director will not be liable for losses to the corporation absent a showing that his act or omission proximately caused the subsequent losses. See Briggs, 141 U.S. at 147, 11 S.Ct. at 929; Michelsen v. Penney, 135 F.2d 409, 419 (2d Cir.1943); Warner v. Penoyer, 91 F. 587 (2d Cir.1898); Francis v. United Jersey Bank, 87 N.J. 15, 432 A.2d 814, 826 (1981); Chicago Title & Trust Co. v. Munday, 297 Ill. 555, 131 N.E. 103 (1921); Wallach v. Billings, 277 Ill. 218, 115 N.E. 382, cert. denied, 244 U.S. 659, 37 S.Ct. 745, 61 L.Ed. 1376 (1917); Coddington v. Canaday, 157 Ind. 243, 61 N.E. 567, 573 (1901).
 
 
 53
 The district court accurately outlined the basic tort principle of proximate cause: proximate cause is "that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred." Stanley, 770 F.Supp. at 1310 (citing Johnson v. Bender, 174 Ind.App. 638, 369 N.E.2d 936 (Ind.Ct.App.1977)). Nor must an action be the sole cause to be the proximate cause; it need only be a substantial factor in producing the injury if the injury were reasonably foreseeable at the time of the wrongful act. Johnson, 369 N.E.2d at 940.
 
 2. Application to this case
 
 54
 After a thorough study of the opinion of the district court, we are convinced that the court understood completely the governing legal principles that we have just set forth. We therefore turn to the question of whether the court applied those principles correctly in this case. In this regard, we note that, for the most part, the district court's determinations are findings of fact or mixed questions of fact and law and are therefore entitled to deferential review.
 
 
 55
 With respect to the liability of those directors who were actively engaged in the business of the bank, including Dan Stanley who was not an "interested director" with respect to any of the loans, the record before us clearly supports the district court's determination. Despite the defendant directors' arguments that they were shielded by the business judgment rule and that the district court did no more than substitute its judgment for theirs, the court clearly, and correctly, determined that, at the time the loans were made, a reasonably prudent director would not have approved such transactions. Such a methodology is not only compatible with the standards that we have noted but certainly does not amount to holding the directors liable as insurers for every business decision of the bank. See Rankin, 149 F. at 1013. It only imposes liability for those transactions that were unreasonable at the time that they were made. Finally, the court focused on the concept of foreseeability as the essential element of proximate cause and held that, on these facts, the directors reasonably could have foreseen that the loans taken on poor or nonexistent collateral would have failed. The court's conclusion is sound. The appellants' contention that the poor farm economy in Indiana at the time of the transactions was the proximate cause of the subsequent losses must also fail. Such an argument ignores the point that a proximate cause need not be the only cause; it need only be a substantial factor leading to the injury, not the sole factor.
 
 
 56
 The directors who were not involved in the daily operations of the bank add additional arguments that we shall now address. Mr. Boley and Dr. Bierman concede that they failed to attend Board meetings during the period when the poor loan acquisitions were being made. They attempt to use this inattention, however, as a shield against liability. Dr. Bierman, in fact, attended no Board meetings after October 5, 1982.[10] Similarly, Mr. Boley attended only one meeting between November 9, 1982, and his resignation in June 1983.
 
 
 57
 Dr. Bierman now argues that the district court erred by finding him personally liable because the court failed to address the critical proximate cause question as to whether his inattention contributed in a significant way to the bank's loss. He maintains also that, while he admittedly failed to attend any meetings, there was no evidence that he did not read the minutes and reports. He further asserts that, in any case, he would not have learned about the problematic loans from those materials because the loans were not considered at the Board meetings.
 
 
 58
 Few distinctions have been drawn between the duties of inside and outside directors. The obligations of an outside director were noted early on in Bowerman, 250 U.S. at 513, 39 S.Ct. at 552, which involved a director who never attended board meetings and never examined bank documents:
 
 
 59
 [it is beyond discussion that he] did not exercise the diligence which prudent men would usually exercise in ascertaining the condition of the business of the bank, or a reasonable control and supervision over its affairs and officers.... He cannot be shielded from liability because of want of knowledge of wrongdoing on his part, since that ignorance was the result of gross inattention in the discharge of his voluntarily assumed and sworn duty.
 
 
 60
 See also Neese v. Brown, 218 Tenn. 686, 405 S.W.2d 577, 580 (1964) (a director is chargeable with the knowledge that he actually possesses or which he might have possessed if he had been diligent in performing his obligations).[11]
 
 
 61
 Against this background, we shall first examine, on the basis of the record before us, what the outsiders should have known about the condition of the bank and whether that knowledge should have put them on notice that heightened vigilance on their part was indicated. Next, we must consider whether, if the outsiders had exercised the degree of vigilance expected of a prudent bank director under the circumstances, they would have learned of the poor loans and could have avoided them.
 
 
 62
 There can be no question that both Mr. Boley and Dr. Bierman were well aware that the ACB was being scrutinized by regulators as early as August 1981 and that the subsequent FDIC Report had criticized lending practices and had stressed the need for the Board to monitor loans more carefully. Dr. Bierman was present at the January 26, 1982 meeting when the first Memorandum of Understanding with the FDIC and the DFI was under discussion and then again at the October 5th meeting when the FDIC's September 1982 Report of Examination was under discussion (indeed, that meeting was Dr. Bierman's last). At that time, participation loans with affiliated banks and poor lending policy were under discussion.[12] In addition, by the October 1982 meeting, it was abundantly clear that the initial concerns of the bank examiners were not being allayed. The danger signals were obvious. Instead of recognizing a renewed responsibility to the bank or choosing to resign from the Board, Mr. Boley and Dr. Bierman chose to absent themselves.[13] Had they continued to attend the meetings, they would have learned of the continued FDIC correspondence and would have had access to the actual correspondence. Tr. at 820, 1550.
 
 
 63
 Even though they were not actively engaged in Board activities at the time, Mr. Boley and Dr. Bierman had an obligation to become familiar with the second Memorandum of Understanding executed in February 1983, which again stressed poor lending policies and practices. In addition, the Minutes of the March 6, 1984 Board meeting stated explicitly that the percentage of substandard loans was higher than it had been in September 1982. At this meeting (which included a number of FDIC representatives), the lamentable condition of the ACB was detailed and specific mention was made about Dr. Bierman's lack of attendance.[14]
 
 
 64
 It should be noted also that Dr. Bierman's and Mr. Boley's memberships on the Board pre-dated those of the other Board members; consequently, the outsiders were on notice, or should have known, that a number of the newcomers to the Board were also affiliated with other banks and that the potential for insider dealings was real. Even if they had not had actual notice of insider status, the subsequent FDIC reports could have left them in no doubt that insider abuses might be occurring. Nevertheless, there is no indication that Dr. Bierman and Mr. Boley took any steps to monitor this situation.
 
 
 65
 Directors are also charged with knowledge of the loan policies in effect during their watch. The loan policy in effect from 1978 to 1983 indicated that all participation loans were to go to the Board for approval as well as other loans if the aggregate was more than $60,000. There was testimony that this policy was regularly ignored. However, a new loan policy manual was circulated on March 29, 1983, that authorized both Ed Stanley and Mr. Marcuccilli to approve all loans up to the bank lending limits. Under the circumstances that faced the ACB, Mr. Boley and Dr. Bierman should have been put on notice that the possibility for abuse was heightened by the new loan policy, which cut the Board of Directors out of loan approval matters in many circumstances.[15]
 
 
 66
 Dr. Bierman maintains that, even if he had been present at the meetings, he would not have been in a better position to intervene with problematic loans because they were not discussed and the papers that were distributed to directors in the form of minutes or reports did not contain the necessary data. Board reports were distributed to the directors with details of the monthly business of the bank. On this court's request, the parties supplemented the appellate record with the Board reports that had been part of the trial record. Board Reports Ex. HAA-HAI.[16] The "New Loans" sections of these reports do no more than list in summary fashion the loans that had apparently already been effected. Indeed, there was testimony that the particular loans were presented to the Board as "done deals." Tr. at 739. There would be little to excite interest in these entries save for the fact that the February 12, 1983 $60,000 loan to Abbott was the largest loan made during that month. See Ex. HAE. Likewise, the March 14, 1983 $70,000 DeVries loan was the largest on that report. See Ex. HAC. The listing of the large aggregates for the April 11, 1983 DeVries loan and the July 19, 1983 Conn loan should have excited some interest. See Ex. HAD, HAI. In addition, the fact that the large June 24, 1983 Conn loan, see Ex. HAG, was identified as a participation loan should have sparked some interest, in light of the bank's track record on such loans. The minutes of the Board meetings for this period are very spare. While some loans were taken under consideration, specific discussions on none of the loans at issue here were recorded. For the most part, the minutes merely mention that the Board considered the Board report for the previous month.
 
 
 67
 Nevertheless, here the district court was entitled to conclude that Mr. Boley and Dr. Bierman abdicated their directorial responsibilities to ACB by their sheer inattention. The outsiders knew full well that the bank was in serious trouble. They knew that there had been risky loans; they knew that the insiders were affiliated with other area institutions; they received only summary reports of new loans; and they could see that the bank's condition was not improving. Under these circumstances, they had a duty to make further inquiries and either involve themselves in bank activities or resign.
 
 
 68
 The district court made a specific finding of proximate cause regarding the outside directors on the basis of Ed Stanley's comment that if a Board member objected to a loan, members "weren't going to cram anything down anybody's throat." Stanley, 770 F.Supp. at 1312. We see no reason to question the district court's determination that Mr. Stanley was credible. An attentive outside director would have found much about which to be suspicious in the large loans that appeared on the monthly reports with only spare collateral information. Consequently, we see no reason to disturb the district court's ruling that the outsiders shared responsibility with the insiders for the improvident loans (with the exception, as we have said above, that Mr. Boley is not responsible for the Conn loans).C. FDIC's Failure to Mitigate Losses
 
 
 69
 The Stanley appellants also argue, by way of affirmative defense, that the losses suffered by the bank as a result of the DeVries transactions were proximately caused not by any wrongdoing on the part of the directors but rather by the FDIC's failure to mitigate losses by shirking collection efforts on the accounts. Specifically, they assert that the FDIC failed to take advantage of the guarantees from Sidney DeVries and the DeVries Trucking Company. The question of whether affirmative defenses may be asserted against the FDIC has been a contentious matter for some time. Here, we need decide but one aspect of that question: whether the FDIC, when it sues former officers and directors in its corporate capacity to recover losses sustained by the insolvent bank and covered by its insurance fund, may be subject to the affirmative defense of failure to mitigate those losses. We believe that this issue can best be understood when analyzed against the backdrop of how the FDIC operates in a case such as this one.
 
 
 70
 In 1933, the FDIC was established by Congress in an effort to promote stability and confidence in the banking system of this country by instituting a system of federal deposit insurance. The corporation functions by providing insurance to protect bank depositors from loss in the event of bank failure, supervising state-chartered, non member-insured banks, and assisting in the event of a bank failure. When the FDIC in its capacity as receiver is appointed, it steps into the shoes of the bank and then either liquidates the assets and pays off the depositors or engages in a purchase and assumption transaction that involves the FDIC in its corporate capacity acquiring assets of the failed institution and then deciding whether to bring suit against the institution's directors and officers to recover losses. See FDIC v. Virden, 893 F.2d 139 (7th Cir.1990) (detailing the procedure involving the FDIC's "dual capacity"); FDIC v. Jenkins, 888 F.2d 1537, 1540-41 (11th Cir.1989) (same).
 
 
 71
 A number of courts have maintained that affirmative defenses such as negligence and failure to mitigate may not be maintained against the FDIC in its receivership capacity because no duty is owed to the directors and officers. Judge Mills of our own circuit expressed the rationale of these cases succinctly:
 
 
 72
 Public policy concerns mandate a finding that the duty of FDIC to collect on assets of a failed institution runs to the public and not to the former officers and directors of the failed institution.
 
 
 73
 FDIC v. Greenwood, 719 F.Supp. 749, 751 (C.D.Ill.1989). The Greenwood court relied heavily on FDIC v. Carlson, 698 F.Supp. 178 (D.Minn.1988) and FSLIC v. Roy, No. JFM-87-1227, 1988 WL 96570 1988 U.S.Dist. LEXIS 6840 (D.Md. June 28, 1988). As the court stated in Roy:
 
 
 74
 FSLIC owes no duty to those institutions or to those whose negligence has brought them to the brink of disaster. Self-evidently, it is the public which is the intended beneficiary of FSLIC, just as it is the public which is the beneficiary of the common law duty imposed upon officers and directors to manage properly the institutions entrusted to their care. Thus nothing could be more paradoxical or contrary to sound policy than to hold that it is the public which must bear the risk of errors of judgment made by its officials in attempting to save a failing institution--a risk which would never have been created but for defendants' wrongdoing in the first instance.
 
 
 75
 Roy, at * 4.
 
 
 76
 In FSLIC v. Burdette, 718 F.Supp. 649, 663-64 (E.D.Tenn.1989) (relying on Roy and Carlson ), the court expanded on this theme:
 
 
 77
 The rule that there is no duty owed to the institution or wrongdoers by the FSLIC/Receiver is simply a means of expressing the broad public policy that the banking laws creating the FSLIC and prescribing its duties are directed to the public good, and that every separate act of the FSLIC as a receiver in collecting assets is not open to second guessing in actions to recover damages from wrongdoing directors and officers.
 
 
 78
 ....The affirmative defenses at issue should be struck, as these defenses would require the public to bear the possible errors of judgment by the FSLIC as receiver rather than the persons found to be guilty of wrongdoing, and removing these defenses will help the court and the jury focus on the real issues presented in the pleadings.
 
 
 79
 Several courts have extended this protection to causes of action, such as this one, in which the plaintiff is the FDIC in its corporate capacity. In Roy, No. JFM-87-1227 at * 3, the court rejected other courts' "close (and unnecessary) distinctions between the various capacities in which FSLIC operates or the spheres of activity in which it has been engaged," preferring to focus on the "special considerations of public policy" that make this sort of case not an ordinary tort case:
 
 
 80
 Banking is a business which directly affects the public welfare, and the law places a heavy duty upon the officers and directors of banking institutions to manage their affairs properly. If officers and directors have negligently recommended and approved a significant number of loans in their institution's portfolio ... they have breached this duty. One of the proximate results of this breach is that FSLIC must assume at least some degree of control over the affairs of the institution....
 
 
 81
 Id. at * 3-4 (citation omitted).
 
 
 82
 More recently, in FDIC v. Isham, 782 F.Supp. 524 (D.Colo.1992), the court struck the defendants' affirmative defenses and, as the decisions we have already discussed have done, chose to rest its decision on the policy in the congressional insurance scheme. The court noted that "FDIC's own conduct cannot be used to defeat or reduce a recovery to the insurance fund because the FDIC does not act to benefit bank officers and directors. Moreover, the FDIC's conduct in fulfilling its mandate involves discretionary decisions that should not be subjected to judicial second guessing." Id. at 532.[17]
 
 
 83
 We believe that these cases take the approach most compatible with the congressional scheme when that scheme is viewed in its totality. An action against directors and officers who allegedly have breached their duties to the bank is an asset purchased by the FDIC in its corporate capacity. It is the duty of the FDIC to manage such assets in order to replenish the insurance fund that has been used to cover the losses allegedly caused by the directors and officers. When the FDIC undertakes this task, it must act in the public interest. Its task is to replenish the insurance fund to cover the expenditures that it has made to cover the losses of the depositors and to maintain confidence in the soundness of the Nation's banking system. Indeed, Congress has made it clear that the FDIC is to exercise its discretion in choosing a course of action in its efforts to replenish the fund. At the time of these transactions, the governing statute provided that "[t]he Corporation, in its discretion, may ... purchase and liquidate or sell any part of the assets of an insured bank." 12 U.S.C. Sec. 1823(d) (1988). Therefore, when the FDIC acts to replenish the insurance fund through the disposition of assets of the failed bank, including the right of action against the officers and directors, it has no duty first to attempt to mitigate the damages attributed to those individuals by seeking other, and perhaps less sure, avenues of relief.
 
 
 84
 The most frequently cited authority to the contrary is FDIC v. Carter, 701 F.Supp. 730 (C.D.Cal.1987). In that case, the court held that an affirmative defense of contributory negligence and failure to mitigate damages, such as the one at issue here, ought to be evaluated in the context of the substantive provisions of the Federal Tort Claims Act (FTCA), 28 U.S.C. Sec. 2671. The court further held that, in applying those substantive criteria, activities of the FDIC in its corporate capacity of disposing of a failed bank's assets are purely ministerial and therefore may not be characterized as a discretionary function under the Act.[18]
 
 
 85
 In this case, the district court was of the view that the Supreme Court's decision in United States v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), conclusively determined that the FDIC is insulated from the affirmative defenses of contributory negligence and failure to mitigate because, under the FTCA, it is serving a discretionary function. See 28 U.S.C. Sec. 2680(a).[19] In Gaubert, the Court considered whether the conduct of the FHLBB and the Federal Home Loan Bank--Dallas, in overseeing a savings and loan institution, fell under the discretionary function exception of the FTCA. The federal agencies had involved themselves in the day-to-day management of the institution; nonetheless, when FSLIC later assumed the receivership of the institution, there was a considerable negative worth. At the same time, Gaubert, the thrift's former chairman and largest stockholder, filed a tort claim against the agencies, alleging that they were negligent in their management of the institution. The Court of Appeals for the Fifth Circuit ruled that the agencies' functions were ministerial (non-discretionary) at the time when they assumed a supervisory role in day-to-day affairs. Gaubert v. United States, 885 F.2d 1284, 1290 (5th Cir.1989). Therefore, the appellate court ruled, the plaintiff could maintain an action under the FTCA.
 
 
 86
 On review, the Supreme Court disagreed. A general directive in 12 U.S.C. Sec. 1464(a) mandated that the FHLBB regulate such institutions "giving primary consideration to the best practices of thrift institutions in the United States." However, the parties could not identify more specific regulations governing the agency's conduct. The Court further noted that "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at ----, 111 S.Ct. at 1274. The Court declined the invitation to recognize a strict dichotomy between discretionary and operational functions; it refused to assume that, with the possible exception of certain technical functions, such as mathematical computations, the day-to-day business functions of a banking institution "are so precisely formulated that decisions at the operational level never involve the exercise of discretion within the meaning of Sec. 2680(a)." Id. at ----, 111 S.Ct. at 1278. Noted the Court: "Day-to-day management of banking affairs, like the management of other businesses, regularly require judgment as to which of a range of permissible courses is the wisest." Id. at ----, 111 S.Ct. at 1275.
 
 
 87
 As the appellants here point out, the Court did not abandon the necessity for a case-by-case assessment of the function at issue, and the decision of the FDIC to initiate a suit against the directors of ACB is not precisely the same function as that at issue in Gaubert. Nevertheless, applying the criteria set forth by the Supreme Court in Gaubert, we think it clear that the FDIC was performing a discretionary function. The responsibilities that devolve onto the FDIC when a bank has failed require quick and complex decisionmaking. We believe that excepting the FDIC from such affirmative defenses is consonant with the purpose of the discretionary function exception to the FTCA:
 
 
 88
 Congress wishes to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.... [Thus] Congress took "steps to protect the Government from liability that would seriously handicap efficient government operations."
 
 
 89
 United States v. Varig Airlines, 467 U.S. 797, 814, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984) (quoting United States v. Muniz, 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805 (1963)).
 
 
 90
 In short, even if assets were available on the DeVries agreements to defray the losses on those loans,[20] and even if the FDIC's failure to claim these assets could be said to have been negligent during the liquidation process, the discretionary exception to the FTCA and the lack of a duty to the wrongdoers would prevent the assertion of affirmative defenses against the FDIC.
 
 Conclusion
 
 91
 For the foregoing reasons, we affirm the judgment of the district court.
 
 
 92
 AFFIRMED.
 
 
 
 *
 The Honorable Milton I. Shadur, Senior District Judge of the Northern District of Illinois, is sitting by designation
 
 
 [1]
 David DeHart, a defendant in the district court, does not take part in this appeal
 
 
 [2]
 It should be noted that the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, 103 Stat. 183 abolished the Federal Home Loan Bank Board (FHLBB) and the Federal Savings and Loan Insurance Corporation (FSLIC) and created the Office of Thrift Supervision (OTS) to regulate state and federal thrifts and the Resolution Trust Corporation (RTC) (as successor to the FSLIC) to oversee thrifts in a conservator or receivership capacity. In addition, FIRREA strengthened the FDIC, giving it, among other powers, the ability to regulate thrifts with the OTS and the power to manage RTC. The FDIC acts as conservator or receiver for insured banks and savings associations chartered under federal or state law. See United States v. Gaubert, 499 U.S. 315, ---- n. 1, 111 S.Ct. 1267, 1271 n. 1, 113 L.Ed.2d 335 (1991); 3 Schlichting et al., Banking Law, Sec. 49 (1992)
 
 
 [3]
 For our exposition of the facts in this case, we rely heavily on the very detailed rendition found in the district court's opinion. See Federal Deposit Ins. Corp. v. Stanley, 770 F.Supp. 1281 (N.D.Ind.1991)
 
 
 [4]
 The FDIC's concerns were discussed at a meeting of the ACB Board of Directors held on October 5, 1982
 
 
 [5]
 Fed.R.Civ.P. 52(a) provides:
 Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.
 
 
 [6]
 FIRREA, 12 U.S.C. Sec. 1821(k), enacted subsequent to the events that gave rise to this appeal, now provides that the FDIC in its capacity as conservator, receiver, or assignee may bring suit against a director or officer of an insured depository institution
 for gross negligence, including any similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined and determined under applicable State law. Nothing in this paragraph shall impair or affect any right to the Corporation under other applicable law.
 This provision has been interpreted by at least two appellate courts as not preempting state law claims based on a lesser degree of culpability. FDIC v. McSweeney, 976 F.2d 532 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2440, 124 L.Ed.2d 658 (1993); FDIC v. Canfield, 967 F.2d 443 (10th Cir.) (en banc), cert. dismissed, --- U.S. ----, 113 S.Ct. 516, 121 L.Ed.2d 527 (1992). But cf. Gaff v. FDIC, 919 F.2d 384, 390-91 (6th Cir.1990), modified on other grounds, 933 F.2d 400 (6th Cir.1991). Neither party has argued before us or in the district court that FIRREA ought to be retroactively applied in this case. See FDIC v. Burrell, 779 F.Supp. 998, 1003 (S.D.Iowa 1991) (holding FIRREA inapplicable when statute was passed after the filing of the action and parties did not mention statute until the second week of trial); see also FDIC v. Haddad, 778 F.Supp. 1559, 1563 (S.D.Fla.1991) (holding FIRREA not retroactive on the basis of the legislative history).
 
 
 [7]
 Prior to FIRREA, "both federal and state courts ... held directors of financial institutions liable for negligent mismanagement of their institutions." Note, The Liability of Officers and Directors Under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 90 MICH.L.REV. 1119, 1123 (1992) (footnote omitted)
 
 
 [8]
 See also Michelsen v. Penney, 135 F.2d 409, 419 (C.C.A.2 1943) (Absentee director may be liable for losses incurred by colleagues "to whom he has abandoned the operation of the bank."); Atherton v. Anderson, 99 F.2d 883, 888 (6th Cir.1938) (directors cannot view management as infallible); FDIC v. Greenwood, 739 F.Supp. 450, 451 (C.D.Ill.1989) (bank director's duty includes supervision over bank officers); Francis v. United Jersey Bank, 87 N.J. 15, 432 A.2d 814, 822, 824 (1981) ("Shareholders have a right to expect that directors will exercise reasonable supervision and control over the policies and practices of a corporation. The institutional integrity of a corporation depends upon the proper discharge by directors of those duties.")
 
 
 [9]
 See also Briggs, 141 U.S. at 148, 11 S.Ct. at 929 ("If [the directors] become acquainted with any fact calculated to put prudent men on their guard, a degree of care commensurate with the evil to be avoided is required, and a want of that care certainly makes them responsible."); FDIC v. Caldwell, No. CV 84-2929 FFF, 1987 WL 110405 at * 3 (C.D.Cal. Nov. 30, 1987) (director should have been more watchful because of abundant evidence of misrepresentation and shoddy practices as well as the obvious deterioration of the bank); Ford v. Taylor, 176 Ark. 843, 4 S.W.2d 938 (1928) (finding the directors grossly negligent after they received a report from a bank examiner that alerted them to the bank's critical condition, but they nonetheless declined to give close attention to bank affairs). In an analogous context, this circuit in Larimore v. Conover, 775 F.2d 890, 896 (7th Cir.1985), held that under the National Bank Act no exemptions could be provided for either new or outside bank directors who had been warned by the Office of the Comptroller about compliance with loan limits but had failed to heed the warning
 
 
 [10]
 In his opening statement, Dr. Bierman's attorney said:
 He did not formally resign, but simply stayed away.... He did not participate in any of the affairs of the bank.
 They may show a document that he may have signed perfunctorily when someone delivered something to his busy office. But as far as any of the operations of the bank we confess we did not participate in them.
 In fact, he was so remote from the bank that when the oath of the directors was prepared for the year 1983, his name didn't even appear on it.
 Tr. at 19-20.
 In addition, on July 24, 1989, Dr. Bierman had filed an unsuccessful motion for summary judgment in which he stated:
 It is undisputed that all of the loans complained of occurred after October 5, 1982 and that Gilbert Bierman attended no board meetings, took no oath of office, and effectively ceased to operate as a member of the Board of Directors of the Allen County Bank after October 5, 1982.
 Bierman had no knowledge of the loans in question, did not participate in the decision-making process to make the loans, and as an outside director, his participation in such decision making would have been ineffective because of the control of the other directors.
 R.119 at 4.
 
 
 [11]
 An outside director who functions as a "figurehead" is engaged in a risky undertaking; such a figurehead may not hide behind his utter ignorance of the business of the corporation. See Francis, 432 A.2d at 823. Noting the dangers of permitting inattentive figurehead directors, the Illinois Supreme Court said:
 It is a matter of common knowledge that men of strong financial ability are asked to serve as directors of banks because of the feeling of security which the public will have from their connection with the corporation. That feeling of confidence arises out of the fact that the public, when depositing money in a savings bank, or when taking stock in the corporation and divesting themselves of control of their property, expect, and have a right to expect, that the men selected as directors of a bank to control the property will exercise ordinary care and prudence....
 Chicago Title & Trust Co. v. Munday, 297 Ill. 555, 131 N.E. 103, 105 (1921) (citing Delano v. Case, 121 Ill. 247, 12 N.E. 676 (1887)).
 In the celebrated case of Smith v. Van Gorkom, 488 A.2d 858 (Del.1985), insiders and outsiders were found equally culpable for abdicating their responsibilities when they approved a corporate takeover on the strength of a 20-minute presentation and an agreement that was first distributed to the directors at the same meeting. Initially, counsel for the defendant directors failed even to argue that outside directors should be treated differently from the insiders. In a second rehearing en banc to consider whether a distinction should be made, the court rejected the outsiders' argument that they were entitled to rely on insiders' reports. The court held that there was gross negligence in the directors' approval of a merger on two hours' consideration. For favorable and unfavorable commentary on Smith, see Donald E. Pease, Outside Directors: Their Importance to the Corporation and Protection from Liability, 12 DEL.J.CORP.L. 25, 40-41 n. 62 (1987).
 On the other hand, the potential usefulness of outside directors has been stressed in the corporate context because of their independence and the fact that they may constitute a check on the activities of the inside director who " 'has a certain amount of self-interest in everything he does.' " Johnson v. Trueblood, 629 F.2d 287, 292 (3d Cir.1980) (citation omitted), cert. denied, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981).
 
 
 [12]
 Mr. Boley was not in attendance at that meeting
 
 
 [13]
 In fact, while Dr. Bierman accepted Ed Stanley's suggestion to stop attending meetings, Mr. Boley apparently retained his position because he believed that his stay in Florida on business would not be protracted. We note that Dr. Bierman continued to receive "committee fees" from ACB following his decision not to attend Board meetings. In addition, he was re-elected to the Board in March 1983
 
 
 [14]
 Significantly, a month later the Board accepted Dr. Bierman's resignation. It is also significant that at this meeting the lack of loan committee minutes was highlighted
 
 
 [15]
 Under the new structure, the Board was to review all loan requests that would cause an individual's aggregate bank debt to exceed $60,000. As for participation loans, the new policy provided that these loans would be treated in the same manner as other loan applications. In other words, under the new system, participation loans were not automatically reviewable by the Board of Directors
 
 
 [16]
 Inexplicably, reports for the months of October, November, and December 1982 and January 1983 are not included. We are unable to determine, therefore, if any mention was made during that time of the Abbott installment lease acquisition that was made on December 30, 1982
 With the exception of the June 24, 1983 Conn loan of $144,755, see Ex. HAG, the loans are not identified as participation loans. The only information that is offered in the summary is the name of the borrower, amount of the loan, date, term, rate, aggregate (an aggregate figure is included only on the $13,000 Conn loan and the $40,000 DeVries loan, see Ex. HAD, HAI). A very sketchy notation is included to indicate the nature of the collateral.
 
 
 [17]
 See also RTC v. Gallagher, No. 92-1091, 1992 WL 370248 at * 5 (N.D.Ill. Dec. 2, 1992) (finding "no logical basis for distinguishing between pre- and post-bank closing activities of the FDIC"); FDIC v. Arceneaux, Civ. A. No. 89-2576, 1990 WL 357532 * 2 (W.D.La. Sept. 14, 1990) (same); FDIC v. Oakes, No. 89-2261-S, 1989 WL 151954 (D.Kan. Nov. 3, 1989) (same)
 By contrast, in FDIC v. Cherry, Bekaert & Holland, 742 F.Supp. 612 (M.D.Fla.1990), the court determined that affirmative defenses were permitted against the FDIC operating in its corporate capacity because "acting in a normal commercial context [the FDIC/Corporate] should be treated no differently than any other litigant." Id. at 614. Unlike the appellants in this case, however, the appellants in Cherry were third parties, and the FDIC asserted an action against them on behalf of the defunct institution as an assignee. In Cherry, the court also relied on FDIC v. Jenkins, 888 F.2d 1537 (11th Cir.1989), and FDIC v. Harrison, 735 F.2d 408 (11th Cir.1984), both of which declined to afford FDIC/Corporate special protected status as against third parties (not bank officers or directors). It also relied on Carter's determination (albeit Carter involved bank directors) that FDIC in its corporate capacity falls outside the public policy concerns. 701 F.Supp. 730. We suggest infra that we do not believe that Carter is faithful to the congressional objective in enacting the banking insurance scheme.
 
 
 [18]
 The Carter court has never garnered a following, having been criticized in its own district a few years later in FDIC v. Baker, 739 F.Supp. 1401 (C.D.Cal.1990), when that court chose, rather, to follow the no duty/public policy rationale enunciated in Roy
 
 
 [19]
 28 U.S.C. Sec. 2680(a) provides that among the exceptions to the FTCA is
 [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
 
 
 [20]
 No allegation is made on appeal that there was a similar failure to mitigate regarding the Conn or Abbott matters
 While the district court made no findings on the matter, we note that it is not at all clear that the FDIC did not attempt to collect from alternate sources on the DeVries transactions. The FDIC obtained $42,000 from the bankruptcy proceedings from the Trucking Company, and it was learned that DeVries had a negative worth of almost one and a half million dollars. The appellants made no effort to show that the FDIC would have been assured of recovery on these guarantees. Therefore, even if the FDIC were subject to affirmative defenses such as the ones asserted here, the appellants might not prevail.