Richard W. BARBER, Personal Representative of the Estate of Barbara W. Reese, Deceased, Plaintiff–Appellee, Cross–Appellant,

v.

John J. RUTH and Lucille A. Ruth, Defendants–Appellants, Cross–Appellees.

Nos. 92–1077, 92–1156 and 92–1529.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1992.

Decided Oct. 15, 1993.

Paul V. Esposito (argued), Douglas A. Lindsay, Thomas M. Weithers, Lewis, Overbeck & Furman, Chicago, IL, for plaintiff-appellee.

James E. Spiotto, Wendy A. Grossman (argued), Franklin H. Top, III, Chapman & Cutler, Chicago, IL, for defendants-appellants.

Before COFFEY and EASTERBROOK, Circuit Judges, and ENGEL, Senior Circuit Judge.[*]

ENGEL, Senior Circuit Judge.

In this diversity case, defendants John and Lucille Ruth appeal the district court's entry of judgment, after trial, in favor of plaintiff Richard Barber, personal representative of the estate of Barbara Reese. Specifically, the Ruths appeal the district court's finding that Ms. Reese, in establishing a joint bank account with the Ruths, did not have the donative intent necessary to create a true joint tenancy. The Ruths also appeal certain aspects of the district court's award of costs. Mr. Barber cross-appeals the district court's award of interest on a general pecuniary bequest that the court applied as a set-off. For the reasons stated below, we AFFIRM the district court's rulings in part, REVERSE the award of costs and of interest on the set-off, and REMAND the cause for recalculation of the set-off and of the award of costs.

I

A

Barbara and Ralph Reese Sr. were married in 1972. Both had adult children from prior marriages. Ralph Sr. had a son, Ralph Jr., and a daughter, Lucy, who married John Ruth. Barbara had a daughter, Marion, who married Rodney Charrier. In 1984, Ralph Sr. was diagnosed as terminally ill. He wished to spend his remaining days at home rather than in a nursing home, but he learned that his medical insurance would not cover the increased cost. He turned to his daughter and son-in-law, the Ruths, for financial assistance. The Ruths eventually advanced approximately $65,000 to cover expenses incurred up to the time of Ralph's death in 1986.[1]

Upon Mr. Reese's death, his entire estate passed directly to Ms. Reese, as all of their assets had been held jointly. Later that year, Ms. Reese decided to sell the family home, located in Florida. Mr. Ruth assisted in the negotiations, and Richard Barber, Ms. Reese's attorney, supervised the closing. Ms. Reese received $160,000 for the house. She informed Mr. Barber that she intended to entrust these funds to Mr. Ruth to invest for her. She made a similar statement in her diary entry for the day. She explained to Mr. Barber that she had a high opinion of Mr. Ruth's expertise in managing investments. She also indicated to Mr. Barber on another occasion that she believed that, by placing the funds in an account owned jointly by her and the Ruths, she could ensure federal deposit insurance coverage up to $300,000.[2]

Four days after the closing, upon the suggestion of the Ruths, who live in Illinois, Ms. Reese transferred $125,000 from an account in Florida to the Harris Trust and Savings Bank in Chicago. Shortly thereafter, the Ruths obtained, signed, and forwarded to Ms. Reese a signature card and account agreement covering a joint money market account. The agreement provided, in part, as follows:

**Account Ownership:** If this account is held in the name of two or more people, the form of ownership is Joint Tenancy

---

[*] Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

[1.] The Reeses' insurer eventually reimbursed Ms. Reese for 80 per cent of the nursing expenses.

[2.] In fact, this belief appears to be mistaken. *See* 12 C.F.R. § 330.7.

with Right of Survivorship unless otherwise specified on your Money Market Account signature card.

Ms. Reese received the card and agreement, signed them both, and returned them to the bank. There is no evidence that she read or understood the terms of the agreement. Her diary entry for the day indicates that she had completed the paperwork for a new bank account, and it does not mention the possibility of a gift.[3]

Over the course of the next several years, Reese deposited into the account a total of approximately $100,000 in additional funds, which represented interest from other investments, the proceeds from the sale of securities, and the like. She also made a number of withdrawals from the account to cover her living expenses. Finally, she instructed Mr. Ruth on several occasions about the proper handling of the account, and she registered her displeasure when Mr. Ruth failed to carry out those instructions.

During this period, Ms. Reese's affections for her friends and relatives seemed to undergo dramatic changes. At times she regarded Rodney and Marion Charrier as lazy and grasping, respectively, while the Ruths were, in her opinion, both wealthy and caring. On other occasions, however, she became displeased with the Ruths, and she regarded the Charriers as a generous and nurturing couple. Her attentions during this period also turned to Beverly Nickel, her personal nurse and assistant.

Ms. Reese's mutable sentiments were reflected in her will, which she changed repeatedly during this period. Ms. Reese and her husband had executed wills under which the estate passed to the survivor and then equally to Marion Charrier, Lucy Ruth, and Ralph Reese Jr. In early October, 1987, Ms. Reese executed a new will, under which all of her personal effects were to go to Marion Charrier, and the residue of the estate was to be placed in trust. The income of the trust was to go to Marion Charrier for life, and then to the Charriers' adopted son for life, and the remainder was to go to Lucy Ruth or her lineal descendants. Approximately three

weeks later, she revised her will once again. This will provided that an antique clock was to go to Beverly Nickel, that $65,000 and her jewelry was to go to Lucy Ruth, that her personal effects and household furnishings were to go to Marion Charrier, and that the residual estate was to be placed into trust, with the income to Marion for life and the remainder over to Lucy Ruth or her lineal descendants. Finally, in April of 1988, Ms. Reese executed her final will. This will provided that $65,000 was to go to Lucy Ruth, and that the residual estate was to be placed in trust, with the income to Marion, and the remainder over to Beverly Nickel or her lineal descendants.

Reese died in 1989. By that time, the joint bank account contained a little over a quarter of a million dollars. This amount, if included in Reese's estate, represented approximately half of the value of the estate. Less than a week after Reese's death, the Ruths withdrew the funds from the joint account and closed the account. Shortly thereafter, Richard Barber brought this action to recover the funds previously contained in the joint bank account.

**B**

Barber sought recovery under the equitable theory of unjust enrichment. The crux of the complaint was that the joint account was not what it purported to be, but rather was an account established for the convenience of Barbara Reese. As the trial date of December 2 approached, the presiding judge noted that, due to a potential scheduling conflict, he could not guarantee that the trial would start before December 12. Mr. Barber was due to appear in a Florida court on December 9, and he requested that his testimony be taken in the form of an evidentiary deposition. The Ruths agreed on the condition that the deposition be videotaped. The deposition was recorded on December 3, Mr. Barber departed, and the trial began on December 4.

The case was tried to a judge. In addition to the recorded testimony of Richard Barber, the trial judge heard the testimony of John

---

**3.** In contrast, Ms. Reese's beneficence on other occasions is duly recorded in her diary, which contains at least three entries mentioning gifts Ms. Reese had given to the Charriers.

and Lucy Ruth, Marion and Rodney Charrier, and Beverly Nickel. The central issue in the case was the intention with which Ms. Reese opened the account. The judge phrased the inquiry as follows:

> [T]he real dispute is what were her intentions with respect to where that money would go when she died. Was there a donative intent as to the future interest at the time the account was created or when subsequent deposits went in.
>
> Probably there is a presumption. For the purposes of deciding this case, I conclude that there is a presumption that has to be overcome by clear and convincing evidence.

*Barber v. Ruth*, No. 90 C 6794, Transcript at 404–05 (N.D.Ill. Dec. 10, 1991). After four days of trial, the judge found for Mr. Barber. On the question of Ms. Reese's intent, he announced his finding as follows:

> [W]hen we get back to the time [the account] was set up and the initial and subsequent deposits went in, between what Barbara Reese told Barber and what she told Beverly Nickel and what she said in her diaries, it seemed to me very clear that her interest was to cover the insurance as she perceived it and have it there so John Ruth could invest it. She wasn't talking in terms of a gift at that point, and there is nothing indicating that she was even thinking in terms of a gift at that point.

*Id.* at 405.

In accordance with these findings, the trial judge entered judgment for Barber in the amount of $218,838. That figure represented the amount in the account less the $65,000 bequest to the Ruths, to which the trial judge added $11,224 in interest accrued since the closing of the joint account. The trial judge also awarded Barber costs in the amount of $6,217. These costs included $530 for videotaping and $387 for transcribing Barber's deposition. The figure also includes $1,021 for the travel and subsistence expenses of Marion Charrier, $1,077 for those of Rodney Charrier, and $1,159 for those of Beverly Nickel.

The Ruths appeal the judgment. They argue that the trial judge failed to adhere to the principle, recognized under Illinois law, that the opening of a joint bank account gives rise to a presumption of donative intent, a presumption that can be overcome only by clear and convincing evidence. Further, they argue that, had the trial judge applied the proper law, the evidence would have been insufficient to rebut the presumption. Finally, they appeal the trial judge's award of costs for the videotaping and transcription of Barber's testimony, and the award of travel and subsistence expenses to the other three witnesses.

Barber cross-appeals the trial judge's award of interest on the $65,000 set-off.

## II

### A

The parties do not dispute that Illinois law governs the analysis of the ownership of the bank account. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In the absence of a dispute, we will not question their choice. *Wood v. Mid–Valley Inc.*, 942 F.2d 425, 427 (7th Cir.1991). Under Illinois law, the opening of a joint bank account raises a presumption that the signatories intended to give to one another a right of survivorship. *Russ v. Greenman (In re Estate of Zengerle)*, 2 Ill. App.3d 98, 276 N.E.2d 128 (1971); *Borucki v. Borucki (In re Estate of Bors)*, 83 Ill.App.2d 447, 228 N.E.2d 127 (1967); *Latek v. Stang (In re Estate of Stang)*, 71 Ill.App.2d 314, 218 N.E.2d 854 (1966); *Murgic v. Granite City Trust and Savings Bank*, 31 Ill.2d 587, 202 N.E.2d 470 (1964). In the words of the Supreme Court of Illinois, "an instrument creating a joint account ... presumably speaks that whole truth." *Murgic*, 202 N.E.2d at 472. The presumption is not, however, irrebuttable. It may be rebutted by clear and convincing evidence that no gift was intended. *Id.; Estate of Zengerle*, 276 N.E.2d at 130. The intent of the decedent must be determined as of the opening of the account. *Estate of Stang*, 218 N.E.2d at 856. Thus, the intent of the decedent at times subsequent to the opening of the account is irrelevant. *Id.* This rule applies even to subsequent deposits made by the decedent;

the character of the account is established at its opening and is unaffected by its owners' subsequent actions, including deposits. *Murgic*, 202 N.E.2d at 472–73. Evidence of acts of the decedent subsequent to the opening of the account may, however, be admitted. This evidence is relevant only insofar as it sheds light upon the decedent's intent at the relevant moment in time. *See id.* at 473 (evidence must "relate back to the time of creation of the account"); *Estate of Zengerle*, 276 N.E.2d at 130 (evidence must "focus upon or relate back to the time the joint tenancy was created"); *Estate of Stang*, 218 N.E.2d at 856 (evidence must "focus upon or relate back to the time of the creation of the joint tenancy").

The Ruths' first assignment of error is that the trial judge failed to give them the benefit of the presumption. This claim is easily refuted simply by referring to the language used by the trial judge, who wrote that, "[f]or the purposes of deciding this case, I conclude that there is a presumption that has to be overcome by clear and convincing evidence." Transcript at 404–05. Concededly, that the trial judge was perhaps not overly resolute in this conviction is evidenced by the sentence he uttered immediately prior to announcing the law: "Probably there is a presumption." *Id.* at 404. Nonetheless, it is not for this court to attempt to identify the effect of the judge's personal misgivings on his ruling. It is enough that he announced his intention to rule in accordance with the law and that his ruling was consistent with that announcement.

■ The Ruths argue next that the trial judge erred in allowing Barber to rebut the presumption of donative intent by introducing evidence of Ms. Reese's intentions at times subsequent to the opening of the account. This claim merits more serious consideration. The trial judge indicated that his ruling was based on Ms. Reese's intent at "the time [the account] was set up and the initial and subsequent deposits went in." *Barber v. Ruth*, No. 90 C 6794, Transcript at 405. The trial court's reference to Ms. Reese's intent at the time of subsequent deposits is particularly troublesome here, since the objects of Ms. Reese's beneficence

appeared to change with some frequency. Accordingly, we rule that the district court's reliance upon evidence of Ms. Reese's intent at the time of subsequent deposits, insofar as the district court accepted that evidence as relevant in itself (as opposed to accepting it as evidence of her intent at an earlier period), was error.

■■ Our inquiry does not end here. Having found the ruling erroneous, we are left to determine whether the ruling constitutes reversible error. Our inquiry is guided by Federal Rule of Civil Procedure 61, which commands this court to leave undisturbed any erroneous ruling that did not "affect the substantial rights of the parties." As this court has held, a trial court's erroneous rulings may be deemed harmless if the record indicates that the trial court would have rendered the same judgment regardless of the error. *Kwasny v. United States*, 823 F.2d 194, 196 (7th Cir.1987) (noting that "[a]n error that would not (if corrected in time) have altered the judge's conclusion is a harmless error, and therefore not a ground for reversal"). *See also TMF Tool Co. v. Siebengartner*, 899 F.2d 584, 588 n. 4 (7th Cir. 1990) (finding application of overly stringent legal standard harmless where record revealed that plaintiff could not state a claim even under more liberal standard).

We conclude that the district court's reliance upon Ms. Reese's intent at the time of subsequent deposits constitutes harmless error. As will be discussed below, the evidence was more than sufficient to support the district court's ruling, even if the court had restricted its inquiry to Ms. Reese's intent at the time of the creation of the account. Furthermore, we are not convinced that the trial court actually considered the evidence of Ms. Reese's later intent as probative in itself, or whether the court deemed that evidence relevant only insofar as it shed light on her earlier intent. We find instructive the following words of the Federal Circuit:

In its focus on the phraseology in the court's opinion, [appellant] reflects its failure to appreciate the appellate function. This court reviews judgments, not phrases. To be relevant on appeal, phrases in a trial court's opinion must be shown not only to

have been used in error, but ... to have served as the basis of the judgment appealed from.

*Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1572 (Fed.Cir.1986) (citation omitted). Because we are not convinced that the district court's reference to Ms. Reese's intent at times subsequent to the creation of the account "served as the basis" of its judgment, we find the error harmless.

**B**

The Ruths argue next that the evidence was insufficient to support the trial court's finding that Ms. Reese lacked the necessary donative intent when she opened the account. To address this claim we must first determine the appropriate standard of review, an issue over which the parties are divided.

*1.*

Federal Rule of Civil Procedure 52(a) provides that "[f]indings of fact ... shall not be set aside unless clearly erroneous." The Ruths, however, assert that whether a trial court's finding as to the decedent's intent at a given point in time does not constitute a finding of fact, but is instead a "mixed question of law and fact involving the application of a legal principle to particular facts." Appellants' Reply Brief at 4. In consequence, they argue that the appropriate standard of review in this court is plenary. In support of this proposition they have referred this court's attention to a vast array of authority, much of which appears to support their contention.[4] Mr. Barber contends that the dis-

trict court's finding regarding Ms. Reese's intent is a finding of fact, which this court may not overturn unless clearly erroneous.[5]

■ Judge Posner has noted that the position advanced by the Ruths—that a district court's determination of the legal significance of historical events is subject to plenary review—is a "recurrent misunderstanding." *Mucha v. King*, 792 F.2d 602, 604 (7th Cir. 1986). Judge Posner conceded that the confusion was understandable, as there has been "much waffling on this point in the cases." *Id.* at 605. *See also Miller v. Fenton*, 474 U.S. 104, 113, 106 S.Ct. 445, 451, 88 L.Ed.2d 405 (1985) (noting that distinction between questions of fact and of law "has been elusive"). We believe that the legal significance of historical facts is itself a question of fact and may not be overturned on appeal unless clearly erroneous. Thus, findings that certain facts establish negligence, *Glenview Park District v. Melkus*, 540 F.2d 1321, 1323 (7th Cir.1976), possession, *Mucha*, 792 F.2d at 606, or a place of business, *Netherlands Shipmortgage Corp. v. Madias*, 717 F.2d 731, 741 (2d Cir.1983); *Riggs v. Island Creek Coal Co.*, 542 F.2d 339, 342 (6th Cir.1976), are reviewed only for clear error. The same rule applies to inferential facts, or facts that must be inferred from the historical facts contained in the record. Thus, findings that certain facts establish discriminatory intent, *Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Anderson v. City of Bessemer City*, 470 U.S.

---

**4.** Specifically, the Ruths cite to the following cases in support of their position: *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); *Baumgartner v. United States*, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944); *Shango v. Jurich*, 965 F.2d 289, 291 (7th Cir.1992); *Etter v. J. Pease Construction Co.*, 963 F.2d 1005, 1008 (7th Cir. 1992); *O'Malley v. Commissioner of Internal Revenue Service*, 972 F.2d 150, 153 (7th Cir.1992); *Elberg v. Mobil Oil Corp.*, 967 F.2d 1146, 1149 (7th Cir.1992); *Guide International Corp. v. United States*, 948 F.2d 360, 361 (7th Cir.1991); *Rexnord, Inc. v. United States*, 940 F.2d 1094, 1096 (7th Cir.1991); *Board of Education v. Illinois State Board of Education*, 938 F.2d 712, 715–16 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992); *Daniels v.*

*Essex Group, Inc.*, 937 F.2d 1264, 1270 (7th Cir.1991); *Jennings v. Tinley Park Community Consolidated School District*, 864 F.2d 1368, 1373 (7th Cir.1988); *Steele v. Hartford Fire Insurance Co.*, 788 F.2d 441, 445 (7th Cir.1986); *Schuneman v. United States*, 783 F.2d 694, 699 (7th Cir.1986); *Hope, Inc. v. County of DuPage*, 738 F.2d 797, 803 (7th Cir.1984); *United States ex rel. Tonaldi v. Elrod*, 716 F.2d 431, 437 (7th Cir.1983); *Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir.1981).

**5.** Mr. Barber restricts his citations to the following: *Pullman–Standard v. Swint*, 456 U.S. 273, 284 n. 14, 102 S.Ct. 1781, 1788 n. 14, 72 L.Ed.2d 66 (1982); *Commissioner v. Duberstein*, 363 U.S. 278, 290–91, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960); *Mucha v. King*, 792 F.2d 602, 604–06 (7th Cir.1986).

564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 534, 99 S.Ct. 2971, 2977, 61 L.Ed.2d 720 (1979), fraudulent intent, *Misty Management Corp. v. Lockwood,* 539 F.2d 1205, 1211 (9th Cir.1976), intent to establish a domicile, *Krasnov v. Dinan,* 465 F.2d 1298, 1300 (3d Cir.1972), or donative intent, *Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1959), are similarly reviewed only for clear error. This rule applies whether the finding constitutes a so-called "ultimate fact," on which the disposition of the case turns, *Pullman–Standard,* 456 U.S. at 287, 102 S.Ct. at 1789; *Miller,* 474 U.S. at 113, 106 S.Ct. at 451, or whether the ruling is based in part on credibility determinations best made by a trial court, *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511. To the extent that any of the cases from this court relied upon by the Ruths suggest a different rule, they do not represent the law of this circuit.[6]

The Ruths refine this argument by suggesting that, where a trial court makes a finding that may only be established by clear and convincing evidence, it seems sensible for an appellate court to accord that finding less deference than might otherwise be appropriate. In such a case, heightened appellate scrutiny might seem to serve the same purposes as the heightened burden of proof in the district court, whatever those purposes may be. This argument has a certain amount of intuitive appeal. Indeed, the Supreme Court has relied on similar reasoning to justify *de novo* appellate review of decisions resulting in deportation or denaturalization[7] and decisions implicating First Amendment concerns.[8] Nonetheless, that Court has refused to extend this rule into other contexts. Particularly instructive is the Supreme Court's failure to apply this rule in criminal cases, which are characterized by all of the elements that support the rule's application in citizenship and First Amendment cases—a high burden of proof, grave consequences, and the necessity of discerning intent.[9] Accordingly, despite the implication of two of these considerations in the instant case, we decline to exercise plenary review outside of the limited domain to which the Supreme Court has restricted the doctrine.

 In deciding whether the evidence supports the district court's conclusion that Ms. Reese had no donative intent at the time of the creation of the account, we therefore accept the district court's findings unless clearly erroneous. This means, as Judge Bauer has paraphrased another member of this court as saying, that the decision must stand unless it strikes us as wrong "with the force of a five-week-old, unrefrigerated dead fish." *Parts and Electric Motors, Inc. v. Sterling Electric, Inc.,* 866 F.2d 228, 233 (7th Cir.1988). It also means, in the equally enlightening but less vivid terminology of Justice White, that, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511. With these principles in mind, we turn to the merits of the Ruths' contention.

**6.** We note that, to the extent *Baumgartner* supports the position advanced by the Ruths, it was largely overruled in *Pullman–Standard,* 456 U.S. at 286 n. 16, 102 S.Ct. at 1789 n. 16, and that *Pullman–Standard* itself lends no support to the Ruths' claim.

**7.** *See Federenko v. United States,* 449 U.S. 490, 506, 101 S.Ct. 737, 747, 66 L.Ed.2d 686 (1981); *Costello v. United States,* 365 U.S. 265, 269–70, 81 S.Ct. 534, 536–37, 5 L.Ed.2d 551 (1961); *Chaunt v. United States,* 364 U.S. 350, 353, 81 S.Ct. 147, 149, 5 L.Ed.2d 120 (1960); *Nowak v. United States,* 356 U.S. 660, 663, 78 S.Ct. 955, 957, 2 L.Ed.2d 1048 (1958); *Knauer v. United States,* 328 U.S. 654, 657–58, 66 S.Ct. 1304, 1306–07, 90 L.Ed. 1500 (1946); *Baumgartner,*

322 U.S. at 670, 64 S.Ct. at 1243; *Schneiderman v. United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943).

**8.** *See, e.g., Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 492, 104 S.Ct. 1949, 1955, 80 L.Ed.2d 502 (1984); *New York Times v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964).

**9.** *See Schneiderman,* 320 U.S. at 125, 63 S.Ct. at 1336; *Fedorenko,* 449 U.S. at 505–06, 101 S.Ct. at 746–47; *Costello,* 365 U.S. at 269, 81 S.Ct. at 536; *Chaunt,* 364 U.S. at 353, 81 S.Ct. at 149; *Klapptrott v. United States,* 335 U.S. 601, 612, 69 S.Ct. 384, 389, 93 L.Ed. 1099 (1949); *Knauer,* 328 U.S. at 659, 66 S.Ct. at 1307.

2.

■ Upon a review of the record, we find that evidence was presented of sufficient clarity to overcome the presumption of donative intent that arose as a result the creation of a joint account. First, Ms. Reese's diary entries describing the opening of the account made no mention of donative intent, although her beneficence on other occasions figured prominently in her diary.[10] Second, there is evidence that she regarded John Ruth as well-qualified to identify and take advantage of worthwhile investment opportunities. There is also evidence that Ms. Reese believed that the existence of three names on the account would ensure federal deposit insurance coverage up to $300,000. Finally, we agree with the observation of the district court that Ms. Reese's manner of lording her will over those around her is inconsistent with her intent to dispose of approximately half of her estate by any method other than devise. It is natural to conclude that Ms. Reese, who obviously desired to encourage specific behavior by providing an incentive, would have wanted that incentive to be as large as possible.

Although as trier of fact we might conceivably have ruled differently, we cannot deem clearly erroneous the district court's finding that this evidence was of sufficient clarity to overcome the presumption of donative intent that arose under Illinois law upon the creation of the account.

## C

The Ruths next appeal certain aspects of the district court's award of costs. Specifically, they object to the award of costs for the videotaping and transcription of Mr. Barber's evidentiary deposition on the grounds that, because the deposition was scheduled for Mr. Barber's convenience, the resulting transcript was not "necessarily obtained for use in the case" as required by 28 U.S.C. § 1920(2) (1988). Additionally, they object to the district court's award of costs representing the travel and subsistence expenses of Beverly Nickel and the Charriers on the ground that real parties in interest may not collect witness fees.

■ Federal Rule of Civil Procedure 54(d) authorizes district courts to award costs to prevailing parties in accordance with specific statutory authorizations. *Commercial Credit Equipment Corp. v. Stamps*, 920 F.2d 1361, 1368 (7th Cir.1990). The most generalized such statute is 28 U.S.C. § 1920, which defines many of the costs that courts may award. *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 440–41, 107 S.Ct. 2494, 2496–97, 96 L.Ed.2d 385 (1987). Under Rule 54(d) and section 1920, "district courts have broad discretion to determine whether and to what extent" to award costs to prevailing parties. *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 852 F.2d 936, 943 (7th Cir.1988). District courts may not, however, award costs not authorized by statute. *Crawford Fitting Co.*, 482 U.S. at 441, 107 S.Ct. at 2497; *Northbrook Excess and Surplus v. Procter & Gamble*, 924 F.2d 633, 642 (7th Cir.1991); *SK Hand Tool Corp.*, 852 F.2d at 943. Thus, we examine closely whether an award of costs is authorized by statute, but we defer both to the district court's decision to award costs and to its ruling on the size of the award. *Northbrook Excess and Surplus*, 924 F.2d at 642; *SK Hand Tool Corp.*, 852 F.2d at 943. Review of these latter two aspects of the award is for

---

**10.** We reject the Ruths' contention that reliance upon the absence of diary entries establishing a donative intent is tantamount to placing the burden of proof on them, in violation of Illinois law. Proof of the absence of an occurrence—here, the formation of donative intent—can be accomplished by reference to the absence of a written record that would normally result from the occurrence. *See* 5 J. Wigmore, Evidence in Trials at Common Law § 1531 (Chadbourne Rev.1974 & Supp.1991) (noting that the practice is akin to "testimony on the stand by a person who denies that a sound took place in his presence because he heard no such sound"). Allowing the raising of such a negative inference does not amount to a displacement of the burden of proof. Thus, where the government offers to prove that a criminal defendant did not receive an unemployment check on the day on which he claimed to have done so, it was "proper for the government to prove non-receipt by proving that there was an absence of any record indicating receipt." *United States v. Robinson*, 544 F.2d 110, 114 (2d Cir.1976).

abuse of discretion. *Brandt v. Schal Associates, Inc.*, 854 F.2d 948, 955 (7th Cir.1988).[11]

*1.*

■ 28 U.S.C. § 1920(2), provides that "[a] judge or clerk of any court of the United States may tax as costs ... [f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." This court has previously held that section 1920(2) authorizes an award of costs associated with the taking of depositions. *See, e.g., State of Illinois v. Sangamo Construction Co.*, 657 F.2d 855, 867 (7th Cir.1981). We have also held that Federal Rule of Civil Procedure 30(b)(4), which allows parties to "stipulate ... that the testimony at a deposition be recorded by other than stenographic means," authorizes the substitution of a videotape for a stenographic transcript. *CCEC*, 920 F.2d at 1368. Accordingly, a district court may tax under Rule 54(d) the costs associated with the videotaping of a deposition. *Id.*

■■ That does not end our inquiry. Under section 1920(2), costs for transcripts may be awarded only upon a showing that they were "necessarily obtained for use in the case." What constitutes "necessity" in this context "has been the subject of considerable controversy." *Hudson v. Nabisco Brands, Inc.*, 758 F.2d 1237, 1243 (7th Cir. 1985). Nonetheless, several general principles may be distilled. First, transcripts need not be absolutely indispensable in order to provide the basis of an award of costs; it is enough if they are "reasonably necessary." *Sangamo*, 657 F.2d at 867. Second, "[t]he determination of necessity must be made in light of the facts known at the time of the deposition, without regard to intervening developments that later render the deposition unneeded for further use." *Hudson*, 758 F.2d at 1243. Thus, that Mr. Barber may ultimately have been available to testify in person at trial does not render the cost of his deposition nontaxable. Finally, courts may not tax the costs of transcripts of depositions provided merely for the convenience of the requesting attorney. *Id.* This principle complicates analysis of the instant case, be-

cause Mr. Barber's reason for requesting that his deposition be taken—a potential scheduling conflict—could be interpreted as arising out of convenience. Nonetheless, we hold that the videotaping of Mr. Barber's deposition was, under the circumstances of this case, reasonably necessary to the prosecution of the case. Accordingly, we cannot deem the court's decision to tax the costs of the procedure an abuse of discretion.

■ Once again, however, our inquiry does not end here. The district court's award of costs relating to Mr. Barber's deposition included $530 for videotaping and $387 for transcription. Our affirmance of the award of costs associated with videotaping is premised on Rule 30(b)(4), which we have interpreted as authorizing the videotaping of depositions *in lieu* of their stenographic transcription. Having affirmed an award of costs related to a substitute for a stenographic transcription, we may not now affirm as well an award of costs for the transcription. Our conclusion is mandated by Rule 30(b)(4), which provides that "[a] party may arrange to have a stenographic transcription made at the party's own expense." More importantly, we are constrained by our ruling in *CCEC*, where our circuit addressed this precise issue and held that district courts could not tax costs for both videotaping and transcription. *Id.*, 920 F.2d at 1369. Accordingly, we hold that the district court abused its discretion in taxing the costs associated with the stenographic transcription of the videotaped deposition.

*2.*

28 U.S.C. §§ 1821 and 1920(3) authorize the award of costs for witness fees. Pursuant to these provisions, the district court taxed as costs the travel and subsistence expenses of Beverly Nickel and the Charriers. The Ruths object to this award on the grounds that, as beneficiaries, the three witnesses are real parties in interest and hence ineligible to collect witness fees.

11. In a pungent gesture aimed at simplifying the various standards of appellate review, this court has recently indicated that it will review discretionary decisions under the same olfactory standard with which we review factual findings, dis-

cussed *supra*. *See Rodriguez v. Anderson*, 973 F.2d 550, 553 (7th Cir.1992); *Dutchak v. Central States Pension Fund*, 932 F.2d 591, 596 (7th Cir.1991).

As a general rule, parties may not normally collect witness fees. *See Hodge v. Seiler*, 558 F.2d 284, 287 (5th Cir.1977); C. WRIGHT, A. MILLER & M. KANE, 10 FEDERAL PRACTICE AND PROCEDURE Civil 2D § 2678, at 376 (1983 & Supp.1992). This prohibition has sometimes been held to extend to real parties in interest. *Morrison v. Alleluia Cushion Co.*, 73 F.R.D. 70, 71 (N.D.Miss. 1976); *Modick v. Carvel Stores of New York, Inc.*, 209 F.Supp. 361, 365 (S.D.N.Y.1962); WRIGHT, MILLER & KANE, *supra*, at 376 n. 11. Beneficiaries to an estate are generally deemed to be the real parties in interest in litigation affecting that estate. *See, e.g., Alderman v. Chrysler Corp.*, 480 F.Supp. 600, 604 (E.D.Va.1979).

There exist many types of relationships between nominal parties and real parties in interest. Even within the narrow context of estates, the role played by beneficiaries in litigation involving the estate can vary broadly according to the type of devise under which the beneficiary claims, the extent to which the beneficiary's testimony bears upon that devise, and the degree to which the beneficiary exercises control over the conduct of the litigation. Under such inherently "fuzzy" circumstances, we are unable to discern a bright line which can be applied in all cases. Rather, we recognize that the question of whether a witness is a real party in interest, and therefore ineligible to receive witness fees, is one of degree. We accordingly appreciate the broad discretion that must be afforded the trial judge in making such determinations.

Here, the record reveals that Beverly Nickel and Marion Charrier (but not Rodney Charrier) each had a significant legal interest in the outcome of the litigation, and that they testified to matters directly affecting those interests. These factors both tend to establish that the witnesses attended the trial as real parties in interest. On the other hand, the record also indicates that the estate's participation in the litigation was ably managed by Mr. Barber, an attorney. This strongly suggests that Ms. Nickel and the Charriers attended trial, not in order to manage the litigation, but simply in order to testify. This in turn supports a finding that the witnesses are entitled to fees. *See Electronic Specialty Co. v. International Controls Corp.*, 47 F.R.D. 158, 162 (S.D.N.Y. 1969); *Tuck v. Olds*, 29 F. 883, 885 (W.D.Mich.1886).

Under these circumstances, we cannot deem the trial judge's decision to award witness fees an abuse of discretion. We accordingly affirm the district court's award of costs.[12]

## D

When Mr. Barber learned that the Ruths had withdrawn the funds from the joint account, he in turn withheld from them the bequest of $65,000. Accordingly, the district court, in ordering the Ruths to remit the funds to the estate, allowed them an offset of $65,000. He also allowed them to retain $11,224 in interest that had accrued on the $65,000. Mr. Barber cross-appeals from the award of interest on the grounds that, under the law of Florida, the state whose law governs the probate proceedings, general devises do not accrue interest during probate. Since, Barber argues, the devise to the Ruths was a general one, the interest that accrued on the set-off should revert to the estate. We review this issue of law *de novo. Elberg v. Mobil Oil Corp.*, 967 F.2d 1146, 1149 (7th Cir.1992).

The parties apparently agree that Florida law governs the award of interest on the legacy to the Ruths, and that the Ruths must remit (probably under Illinois law) any income earned and retained on the funds held for Mrs. Barbara Reese during her lifetime but payable by them now to her estate. In the absence of a dispute, we will not question these assumptions. *Wood*, 942 F.2d at 426–27. The relevant portion of Florida's probate code provides as follows:

12. The Ruths also contest the amount of fees awarded, complaining that the district court awarded subsistence expenses to the witnesses for the entire duration of the trial, rather than just for the days on which they testified. We have examined the record and we are satisfied that the witnesses properly took advantage of the convoluted airline fare structures by remaining at trial longer than was strictly necessary.

Unless the will otherwise provides, income from the assets of a decedent's estate after the death of the testator and before distribution ... shall be ... distributed as follows:

> (a) To specific devisees, the income from the property bequeathed or devised to them respectively, including an appropriate portion of interest accrued since the death of the testator....
>
> (b) To all other devisees, *except devisees of pecuniary bequests not in trust,* the balance of the income, including interest accrued since the death of the testator, ... in proportion to their respective interests in the undistributed assets of the estate computed at times of distribution on the basis of inventory value.

FLA.STAT. § 738.05(2) (1991) (emphasis added).

Article V of Ms. Reese's last will provides as follows: "I hereby devise the sum of SIXTY-FIVE THOUSAND ($65,000) DOLLARS to my step-daughter, LUCILLE ANN RUTH, if living; if not, then to her lineal descendants." This bequest qualifies as a "pecuniary bequest not in trust," and, accordingly, it does not earn income during administration of the estate. It matters not that it was held by the devisee rather than by the administrator. Indeed, it would defy logic to reward a devisee for withholding funds from the estate by allowing the devisee to collect interest.[13] Accordingly, we hold that the district court erred in including $11,224 in interest in the offset award.[14]

### E

In a separate motion that has been referred to this panel, Mr. Barber asks this court to tax appellate fees against the Ruths as a sanction under FED.R.APP.PROC. 38 on the ground that the Ruths' appeal is frivolous. The Ruths in turn, relying on *General Electric Co. v. Speicher,* 877 F.2d 531, 538 (7th Cir.1989) and *Foy v. First National Bank,* 868 F.2d 251, 258 (7th Cir.1989), have requested sanctions on the ground that Mr. Barber's motion for sanctions is itself frivolous. In light of the apparent confusion in the courts surrounding the proper standard of review,[15] an issue which the parties appear to believe dispositive of this case, Mr. Barber's motion is not well taken. Conversely, however, we cannot hold that the issue was so murky that Mr. Barber's motion for sanctions is completely groundless. Accordingly, we DENY both motions for sanctions.[16]

### III

For the foregoing reasons, we AFFIRM in part and REVERSE in part the judgment of the district court, and we AFFIRM in part and VACATE in part the district court's award of costs. We REMAND for recomputation of the setoff and for recalculation of costs consistent with this opinion. We DENY both parties' motions for sanctions.

Each party shall bear its own costs on appeal.

---

**13.** This is particularly true in light of § 733.607, which provides that a personal representative must demand, and § 733.812, which provides that a distributee must return, improperly distributed property.

**14.** The Ruths argue that § 738.05(2) is in effect "trumped" by § 732.514, which provides that legacies and devises vest at the time of the testator's death. They also point out that Florida property law recognizes a right of set-off. Finally, they direct this court's attention to a number of bankruptcy cases that they feel somehow support their position. None of the law to which the Ruths have referred us, however, contradicts § 738.05(2), or is even relevant to the question of the ownership of interest on general pecuniary bequests accrued during administration.

**15.** *See* section II(B)(1), *supra.*

**16.** In reviewing the record in this appeal, one is bound to entertain considerable sympathy for all of the parties to it, whose relationships with one another may have been seriously impaired, not by any fault of their own, but by the mischief practiced upon their emotions by the decedent. Mrs. Reese, while undoubtedly a decent and loving person, nevertheless, through her chimerical attitude toward her estate, seems to have wrought an even greater injury than confusion by endangering that familial affection which ought to be the chief legacy of any parent.