UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles Floyd HUMPHREY and Isabelle Heyder, Defendants–Appellants.

Nos. 93–1658, 93–1659.

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1994.

Decided Sept. 8, 1994.

Norman R. Smith, Asst. U.S. Atty. (argued), Christopher W. Dysart, Criminal Div., Fairview Heights, IL, for U.S. in No. 93–1658.

Aaron E. Haith (argued), Indianapolis, IN, for Charles Floyd Humphrey.

Norman R. Smith, Asst. U.S. Atty. (argued), Christopher W. Dysart, Margaret

Mary Robertie, Office of U.S. Atty., Criminal Div., Fairview Heights, IL, for U.S. in 93–1659.

William A. Alexander (argued), Troutt, Alexander, Popit & Warner, Benton, IL, for Isabelle Heyder.

Before POSNER, Chief Judge, BAUER, Circuit Judge, and TINDER, District Judge.[*]

BAUER, Circuit Judge.

Charles Humphrey and Isabelle Heyder were each convicted of conspiring to defraud the United States. 18 U.S.C. § 371. Humphrey was also convicted on three counts of making false statements to a government agency. 18 U.S.C. § 1001. Humphrey and Heyder appeal their convictions, and Humphrey challenges his sentence. We affirm.

## I.

This case centers around the activities of Paragon Health Care Systems ("Paragon"), a corporation owned and operated by Charles Humphrey. Until its dissolution in July of 1990, Paragon rented and sold durable medical equipment to patients for residential use. An investigation of the company revealed a pattern of fraudulent activity in its rental of oxygen concentrators to patients covered by Medicare. Paragon would first rent used oxygen concentrators to patients and then submit a claim to Medicare for reimbursement of the rental price. Then, on behalf of the same patient, Paragon would submit a second reimbursement claim to Medicare, this time for the purchase price of a new oxygen concentrator when in fact the patients were still using the rented machines. Investigators from the Department of Health and Human Services ("HHS") and the Federal Bureau of Investigation testified that although Paragon purchased only two new oxygen concentrators from its supplier between April of 1987 and March of 1988, Paragon submitted to Medicare thirty-six claims for new units sold. Paragon's records also indicated that during the same time, no new machines were delivered to any of the Medicare patients.

Isabelle Heyder was employed as a claims supervisor for Blue Cross and Blue Shield of Illinois ("Blue Cross"), the entity in charge of processing Medicare claims in the region. Evidence at trial established that Paragon employees would deliver their claims to Heyder in person and that she would ensure that Paragon's claims were processed in a special manner. Customarily, control numbers which replicated the serial numbers on the machines were assigned to all claims for durable medical equipment. In Paragon's case, over 100 claims were treated as "Special Projects", dispensing with the need for assigning control numbers and making it difficult to trace the claim to the exact machine. One claims reviewer testified that she knew of no other claims that were handled in this fashion and that pursuant to Heyder's instructions, she had paid Paragon for claims ordinarily considered nonpayable.

In late 1986, while still employed at Blue Cross, Heyder started working for Humphrey. It is not clear by which of Humphrey's business entities she was formally employed, but undisputed is that while working for Humphrey, Heyder was still overseeing the payment of Paragon's Medicare claims. Heyder claims that she was working for Heartland Leasing, a company which rented durable medical equipment to equipment suppliers. Testimony by a Paragon employee suggests, however, that the Heartland Leasing arrangement was a sham and that Heyder was in fact working for Paragon preparing the same Medicare claims that she would later review at Blue Cross. After leaving Blue Cross in November of 1987, Heyder went to work full-time for Paragon, submitting Medicare claims for equipment. She testified that she never knowingly submitted false claims.

On October 22, 1992, a federal grand jury issued a four count indictment charging both Humphrey and Heyder with one count of conspiracy to defraud the United States, 18

---

[*] The Honorable John D. Tinder, United States District Judge for the Southern District of Indiana, is sitting by designation.

U.S.C. § 371, and charging Humphrey with three counts of wilfully making false statements to a government agency. 18 U.S.C. § 1001. A jury convicted both defendants as charged on November 16, 1992. Humphrey was sentenced to eighteen months imprisonment and three years supervised release. He was also ordered to pay $11,567 in restitution to HHS. Heyder was sentenced to five years probation.

## II.

### A. Motion to Suppress

■ During the course of their investigation, agents of the FBI and HHS made attempts to contact Humphrey through his mother and his parole officer. On the advice of his parole officer, Humphrey agreed to meet with two agents on August 8, 1991 at the FBI's offices in Carbondale, Illinois. The agents informed Humphrey that they were investigating him in connection with Paragon's Medicare claims. Because the agents did not consider Humphrey to be in custody, they did not provide him with *Miranda* warnings. He was told that he was free to leave at any time and free to contact an attorney if he so desired. Humphrey, nevertheless, stayed and answered a variety of questions about Paragon's operations. He also met with the agents the next day in Paducah, Kentucky and turned over all Paragon business records that were in his possession. Humphrey argues on appeal, as he did below in his unsuccessful motion to suppress, that the statements he made to FBI and HHS agents in the interview as well as the business records he provided the government should not have been admitted into evidence because they were the result of an interrogation given without *Miranda* warnings.

■ *Miranda* warnings need only be provided when suspects are in custody. *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990). One is in custody when one's movement is restrained to the degree comparable to a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). Unless clearly erroneous, we accept the district court's factual findings and credibility determinations on this issue. The ultimate issue of whether there was custodial interrogation is, however, a mixed question of law and fact subject to independent appellate review.[1] *United States v. Fazio*, 914 F.2d 950, 955 (7th Cir.1990).

The evidence substantiates the district court's finding that Humphrey was not in custody during the interview. According to one of the agents' testimony, Humphrey was constantly reassured that he could leave when he wanted. Humphrey left the office at one point to inform his girlfriend not to wait for him. Then, at the conclusion of the interview, Humphrey returned to his mother's house in Paducah. There is no evidence that he was placed under arrest or at any time confined to the office. Humphrey's claim is that he felt compelled to cooperate with the agents because if he did not, they would somehow get his parole revoked.

In *Minnesota v. Murphy*, 465 U.S. 420, 437, 104 S.Ct. 1136, 1147, 79 L.Ed.2d 409 (1984), the Supreme Court considered whether the possibility of probation revocation could trigger *Miranda* protections. The Court drew a distinction between compulsion to appear and testify truthfully and compulsion to forego one's Fifth Amendment rights. Specifically, the Court held that the legal compulsion to answer questions truthfully subject to the possibility that probation

---

1. In recent cases in this circuit, we have adopted the clearly erroneous standard of review where mixed questions of law and fact present fact-specific applications of law. *See, e.g., United States v. Spears*, 965 F.2d 262, 265 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992) (holding that appellate review of decisions to issue search warrants should be deferential rather than plenary). Underlying this trend is the belief that the trial courts remain better positioned than the appellate courts to make those legal determinations which by nature are highly fact-intensive. Nevertheless, we have yet to adopt this standard for reviewing whether a particular interrogation was "custodial." *United States v. Jones*, 21 F.3d 165, 168–69 (7th Cir.1994); *United States v. Smith*, 3 F.3d 1088, 1091 (7th Cir.1993). Because the parties in this matter do not raise the issue, and because the difference in standard would not affect the outcome of this case, we do not feel that this would be the proper occasion to consider whether a different standard is appropriate.

might be revoked was insufficient to require *Miranda* warnings because such a condition does not penalize the right to remain silent. The Court stated that unless a state overtly threatens to revoke probation in retaliation for the legitimate exercise of the self-incrimination privilege, there is no reasonable basis for a probationer to believe that his Fifth Amendment rights are in jeopardy. *Id.* at 438, 104 S.Ct. at 1148.

Humphrey does not allege that had he asserted the Fifth Amendment privilege, the government agents would have reported him as having violated his parole. Nor does he claim that the terms of his parole prevented him from exercising this privilege. Humphrey fails to provide us with any facts which would render reasonable the belief that he could not freely refuse to answer questions or to produce Paragon's records. Humphrey claims only that he felt obligated to cooperate. This obligation is no different than that facing a witness summoned to testify before a grand jury. Under *Murphy,* this is clearly insufficient to require *Miranda* warnings, and therefore, the court's decision to deny Humphrey's motion to suppress was appropriate.

### B. Sufficiency of the Evidence

■ Humphrey and Heyder challenge the sufficiency of the evidence underlying their convictions. Both contest the conspiracy count, and Humphrey also challenges his three convictions under 18 U.S.C. § 1001. Our standard of review is familiar. We will reverse a conviction for insufficient evidence only if, after viewing the evidence in a light most favorable to the government, we determine that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Hooks,* 848 F.2d 785, 792 (7th Cir.1988).

■ We consider the challenge to the conspiracy conviction first. To prove a conspiracy, the government must establish beyond a reasonable doubt: (1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) intent to commit the substantive offense. *Id.* Because of the clandestine nature of most conspiracies, they must often be proven using circumstantial evidence. Humphrey and Heyder both insist that there was no evidence of any agreement to do anything illegal. They claim that even if Heyder was moonlighting for Humphrey and even if Paragon was given special treatment at Blue Cross, since neither of these was illegal per se, the government failed to meet its burden. Humphrey and Heyder also contend that their conspiracy convictions should be overturned on sufficiency grounds because the government documentation of Paragon's operations was incomplete.

Neither of these claims warrants reversal of the conspiracy convictions. The government's presentation at trial was replete with evidence which supported the conviction. Medicare records confirmed that Paragon was paid for several new oxygen concentrators provided to Medicare patients even though Paragon's records showed that Paragon had never purchased nor delivered new machines. The evidence showed that claims for these machines were prepared according to Humphrey's directions, who also arranged for their personal delivery to Heyder at Blue Cross. Testimony provided by Bonnie Bozovich, another Paragon employee, indicated that while still employed by Blue Cross, Heyder was also working for Paragon and more specifically, working on Medicare claims. Employees at Blue Cross confirmed that Paragon's claims were processed in a unique fashion. Frankie Lynn Klein, a claims reviewer who worked under Heyder, stated that only Paragon's claims were processed without a control number and that Heyder instructed her on more than one occasion to pay claims that had been determined to be nonpayable.

This evidence is clearly sufficient to support the jury's finding on the conspiracy count of the indictment. From the surreptitious manner in which the claims were delivered and the special way in which they were processed, a rational jury could believe that Paragon, under Humphrey's direction and with help from someone in the claims office, was submitting fraudulent claims. Since all claims were personally delivered to Heyder, and since she was for a time working for

Paragon as well, it would be logical to conclude that she was involved in the scheme. Such a conclusion would be rationally derived from the evidence at trial.

Regardless of whether Heyder's employment by Humphrey or the special treatment received by Paragon was legal, both facts could support an inference of guilt. Based on the evidence in the record, the verdict on the conspiracy convictions was perfectly defensible.

■ Humphrey also challenges the sufficiency of the evidence supporting his three convictions under 18 U.S.C. § 1001. To secure a conviction under this statute, the government must prove beyond a reasonable doubt that the defendant knowingly and willfully made a false material statement in a matter within the jurisdiction of a federal agency. *United States v. Dick*, 744 F.2d 546, 552 (7th Cir.1984). The three counts in this case stem from three instances in which Paragon submitted claims for new oxygen concentrators but never delivered new machines to the patients.

Humphrey claims that the evidence offered in support of these charges was insufficient to support his conviction because the government was not in possession of all of Paragon's records. Humphrey argues in the alternative that his control over the ordering and delivery was too tenuous for a jury to find him culpable of making fraudulent claims.

These arguments are without merit. In support of each of the three counts, the government introduced into evidence the Medicare claim forms submitted by Paragon to Blue Cross for new concentrators and Paragon's records for each of the three patients which indicate that the patients were never supplied with anything but used concentrators. We find this evidence sufficient to create an inference that the claim forms were false or misleading. That other potentially exonerating records may have existed does not forbid a conclusion of guilt based on the evidence which was presented. In fact, it was argued to the jury and rejected.

■ Humphrey's claim that he was not sufficiently involved in the ordering and delivering of equipment is contradicted by evidence in the record. Bozovich's testimony that the claim forms were prepared according to Humphrey's instructions could have led the jury to believe that the scheme was Humphrey's idea. Additionally, Humphrey's signature was on some of the fraudulent claim forms submitted to Blue Cross.

### C. Motion for Mistrial

■ During the government's direct examination of FBI agent, Brenn Tallent, he testified that Heyder, while employed by Humphrey, admitted to filling out three or four claim forms for new oxygen concentrators, although she knew that the patients had not received new machines. On cross-examination, Heyder's attorney intended to have Tallent elaborate on this statement in a way that would inculpate Humphrey. In doing so, however, Heyder's attorney recognized that he would run into what is commonly referred to as a *Bruton* problem: eliciting statements inculpating one conspirator made by a nontestifying coconspirator.[2] *See Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

After a hearing outside the jury's presence, the court ordered that Tallent's testimony regarding Heyder's admission be stricken from the record and disregarded by the jury. Arguing that the statement was too prejudicial to be ignored by the jury, Heyder then moved for a mistrial. Her motion was denied, and now she appeals.

■ We review the trial court's decision for an abuse of discretion. "In deciding whether the court abused its discretion, we assume that the trial judge is in the best position to determine whether an incident was so serious as to warrant a mistrial." *United States v. Canino*, 949 F.2d 928, 937 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). When a curative instruction is given as here, the court must "presume[ ] that the jury will follow an instruction to disregard inadmissible evidence unless there is an 'overwhelming

2. As it turned out, Heyder did eventually testify on her own behalf.

probability' that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *United States v. Soria*, 965 F.2d 436, 441 (7th Cir.1992) (citations omitted). In making this determination, the court should evaluate the timeliness and effectiveness of the curative instruction as well as the record as a whole to ascertain whether any prejudice was alleviated. *Wilson v. Groaning*, 25 F.3d 581, 587 (7th Cir.1994).

Heyder claims that without the stricken testimony, the jury would not have had sufficient evidence to convict her. In essence then, her position is that the jury's verdict itself is evidence that they could not follow the instructions. As we have already made clear, however, the record contains a more than adequate basis for the jury's conclusion, and we need not revisit that issue here. Moreover, the promptness and the clarity with which the instruction was given tend to undermine the claim that the jury disregarded the instruction out of confusion. We, therefore, hold that a mistrial based on the stricken testimony was not necessary and that the trial court properly proceeded.

### D. Evidence of Cooperation

■ Heyder attempted to introduce evidence of an interview she had with local law enforcement officers pertaining to a burglary which they were investigating. Humphrey was, at the time, a suspect in the crime and the police wanted to question Heyder. In the interview, Heyder claims to have told the police that there were some problems with Humphrey's Medicare claims. The burglary investigation was completely unrelated to the Medicare fraud and there was no possibility that the local law enforcement officers were interested in the fraud. Humphrey eventually pleaded guilty to third-degree burglary. The court excluded this interview from the evidence because it felt the unduly prejudicial impact to Humphrey outweighed the remote probative value which this evidence might have. Heyder was permitted, during her own testimony, to introduce evidence of her cooperation with federal authorities in their investigation of this case.

Claiming that this evidence was probative of her lack of criminal intent, Heyder asks that we reverse the trial court's decision. We review this claim under the abuse of discretion standard which is satisfied by a showing that no reasonable person could take the view of the trial court. *United States v. Hilgeford*, 7 F.3d 1340, 1345 (7th Cir.1993).

Because we find no abuse of discretion, we leave the trial court's decision intact. Testimony about Humphrey's prior criminal record for purposes other than impeachment would have been unfairly prejudicial. Because the burglary investigation was focused on Humphrey individually, the activities of Paragon were of no interest to the local authorities. By telling them that there were "some problems" with Paragon's Medicare claims, Heyder was hardly coming clean about the fraud. Consequently, Heyder's statements would have been probative of little other than Humphrey's character.

### E. Juror Disqualification

■ After the testimony of Evelyn Knoob, a Blue Cross claims reviewer, one of the jurors, Rose Stout, informed the court that Knoob and Stout's husband were cousins. Judge Foreman questioned her thoroughly, asking finally, "[W]ould it make a difference to you or would it not make a difference to you?" Stout responded that her relationship to Knoob would not affect her decision, and over Heyder's objection, Judge Foreman permitted Stout to remain on the jury. Heyder argues that the court's failure to replace Stout with an alternate juror was reversible error.

Rule 24 of the Federal Rules of Criminal Procedure governs the selection and replacement of trial jurors. Section (c) provides for the replacement of jurors with alternates if a juror is "found to be unable or disqualified to perform their duties." The decision to remove a juror under this section is committed to the sound discretion of the trial judge, and if the record shows some legitimate basis for that decision, there is no abuse of discretion. *United States v. Peters*, 617 F.2d 503, 505 (7th Cir.1980). Before a conviction will be overturned on this grounds, some showing of prejudice is necessary. *Id.*

We reject the notion that the court's failure to replace Stout was reversible error. In the presence of the attorneys, Judge Foreman repeatedly asked Stout if her husband's relationship to Knoob made her any more or less believable as a witness. Stout insisted that it did not. Clearly, this alone qualifies as a legitimate basis for keeping her on the jury. Perhaps more importantly, Heyder has not adequately demonstrated that Stout's presence on the jury prejudiced her case. We, therefore, uphold the court's ruling on this matter.

### F. Restitution

■ As part of its sentencing determination, the court calculated a restitution award based on the amount of loss sustained by the government. The calculation was based on multiplying the number of fictitious sales by the difference between the amount reimbursed for sale of a new machine and the amount reimbursed for sale of a used machine, $165. The government's evidence also revealed that Paragon had submitted three claims for the same machine. To account for this transaction, the court, in addition to the $165 lost on the first sale, tacked on another $4,802 which represented the sum of the full reimbursements on the second and third sales of the same machine. Humphrey contends that this was erroneous, arguing that the government only lost $165 on each of the two additional sales.

Humphrey's math is not based on the evidence. If there were evidence to suggest that Paragon ever repurchased the machine before reselling it on the second and third instances, then perhaps $165 would be the proper amount of loss. In this case, however, there is no evidence showing that Paragon repurchased the machine. The evidence indicates that Paragon simply submitted the claims for the same machine three times without ever moving or repurchasing the machine. Because Paragon never incurred any costs in connection with the second and third sales, the Medicare reimbursement to Paragon was pure profit. The court's decision to include the full purchase price on the latter two sales in the restitution award was, therefore, wholly proper.

### III.

For all of the foregoing, Heyder's conviction and Humphrey's convictions and sentence are, in all respects,

AFFIRMED.

POSNER, *Chief Judge,* concurring.

I agree with everything in the majority opinion except the discussion of the standard of appellate review of determinations of custodial interrogation. I believe it is plain that the proper standard is not review de novo, but rather review for clear error, and I see no reason to avoid saying so.

The police are required to give the *Miranda* warnings to anyone whom they subject to a custodial interrogation. Two questions can arise: Was there an interrogation? Was it custodial? The first, clearly, is what the law calls a "mixed question of law and fact"; more illuminatingly, it is a question about the application of a legal concept, that of "interrogation," to the facts as a lay person would understand them. Ordinarily such questions are treated for purposes of appellate review like questions of fact, and the clear-error standard is therefore applied. That is, in fact, how we have treated cases in which the question—Was there an interrogation? Or did the defendant volunteer a damning statement without having been asked?—has arisen. *United States v. Laughlin,* 772 F.2d 1382, 1386 (7th Cir.1985); *Robinson v. Percy,* 738 F.2d 214, 218–19 (7th Cir.1984). There is no reason to treat the question—Was the suspect in custody?—differently.

This court has been a leader in insisting that clear error is the correct standard for all so-called mixed questions of law (with a handful of exceptions, irrelevant here, founded mainly on First Amendment concerns and sanctified by Supreme Court decisions). See, e.g., *Barber v. Ruth,* 7 F.3d 636, 642–43 (7th Cir.1993); *Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan,* 3 F.3d 994, 999 (7th Cir.1993); *FDIC v. Bierman,* 2 F.3d 1424, 1432 (7th Cir.1993); *Williams v. Commissioner,* 1 F.3d 502, 505 (7th Cir.1993); *United States v. Spears,* 965 F.2d 262, 270–71 (7th Cir.1992); *United States v. Levy,* 955 F.2d 1098, 1103 n. 5 (7th

Cir.1992); *Mucha v. King,* 792 F.2d 602, 604–06 (7th Cir.1986). Although there is not a perfect uniformity in our decisions, we said in *Barber v. Ruth, supra,* 7 F.3d at 643 (footnote omitted), "to the extent that any of the cases [of this court relied on by the appellants in that case] suggest a different rule, they do not represent the law of this circuit."

The question whether a given interrogation was "custodial," like the question whether the defendant's statement came in response to an "interrogation," is one of applying a legal concept to facts, since "custody" is a legal concept, just like "interrogation." It might seem that "custody" is only nominally a legal concept—that you don't have to be a lawyer to know that a person is in custody when he is not free to leave; if he tried he would be stopped. The intentions of the police and the understanding of the suspect are facts that, unlike negligence, or possession, or "interrogation," do not require any filtering through legal concepts. If that were true, it would be even plainer that the proper standard of appellate review was clear error, as no one doubts that in the case of a "pure" question of fact, the trial court's finding must be upheld unless clearly erroneous. Fed.R.Civ.P. 52(a).

It is not true. The legal definition of custody departs from the lay understanding. The intentions of the police have been ruled out of bounds and so too the understanding of the suspect. He is in custody only if a reasonable person in his position would not think himself free to leave. *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Stansbury v. California,* ─── U.S. ───, ─── ─ ───, 114 S.Ct. 1526, 1529–30, 128 L.Ed.2d 293 (1994) (per curiam). As in the law of negligence, so in the law as to when the *Miranda* warnings must be given, the question whether a person acted reasonably in the circumstances facing him is a question about the application of a legal standard (reasonableness) to the facts. No doubt the line between pure facts on the one hand and, on the other hand, the application to them of a legal standard that is as

non-technical—as commonsensical—as reasonableness is a faint one. But that is simply one more reason why both questions are and should be governed by the same standard of review, that of clear error.

The majority opinion cites *United States v. Fazio,* 914 F.2d 950, 955 (7th Cir.1990), for the proposition that appellate review of a finding that the defendant was in custody is plenary. See also *United States v. Smith,* 3 F.3d 1088, 1091 (7th Cir.1993). In fact *Fazio* left the issue open. See 914 F.2d at 955 n. 5. And the precedential value of the only case on which *Fazio* relied for the proposition that review might be plenary rather than deferential, *United States v. Hocking,* 860 F.2d 769, 772 (7th Cir.1988), was later described by this court as having been "vitiated" by the cases establishing clear error as the standard for reviewing mixed questions of fact and law. *United States v. Levy, supra,* 955 F.2d at 1103–04 n. 5. It is instructive to consider the two cases on which *Hocking* had (without any independent analysis) based its conclusion that appellate review of a finding of custodial interrogation is plenary. *Schuneman v. United States,* 783 F.2d 694, 699 (7th Cir.1986), was a tax case which merely recited, what plainly is no longer the view of this court, that review of mixed questions of law and fact is plenary. *United States ex rel. Tonaldi v. Elrod,* 716 F.2d 431, 437 (7th Cir.1983), was a habeas corpus case. The issue was not appellate review, but the scope of 28 U.S.C. § 2254(d), which governs the weight that federal district courts in such cases must give to findings of fact by state courts. And *Tonaldi* has no remaining vitality even in its limited domain, for it was overruled in *Perri v. Director,* 817 F.2d 448, 451 (7th Cir.1987). *Hocking* thus rests on air; *Fazio* on *Hocking;* this case on *Fazio*— but I repeat that *Fazio* holds that review of a finding on whether there was custodial interrogation *may* be plenary, not that it is. Plainly it isn't. A recent opinion by the author of *Fazio* points out that not only are the other circuits divided over the issue but so are the decisions of this court, and again treats the issue as an open one, declining to resolve it only because the outcome would not be affected. *United States v. Jones,* 21 F.3d 165, 169 (7th Cir.1994). To similar ef-

fect, see *United States v. Menzer*, 29 F.3d 1223, 1230 (7th Cir.1994).

Must the issue continue to fester? The correct resolution is clear; the only decision squarely in the way—*Hocking*—has been thoroughly discredited; and the majority opinion does not even suggest a reason for treating the issue of custody differently from other mixed questions of fact and law. Nothing is gained by deferring the inevitable, except to perpetuate confusion and disarray in our precedents. Caution is a judicial virtue; but it is not the only judicial virtue. We should be hesitant to create intercircuit conflicts and to overrule decisions of this circuit, but we should be quick to terminate gratuitous intracircuit conflicts.